REECE SHOE MACHINERY CO. v. UNITED SHOE MACHINERY CO.

(Circuit Court of Appeals, Third Circuit. July 30, 1917.)

No. 2250.

PATENTS ⬥⟹328—INFRINGEMENT—STOP MOTION.

The Goodyear patent, No. 818,159, for a stop motion for high-speed machines, especially designed for use on power sewing machines, is limited by the proceedings in the Patent Office to a mechanism for effecting a stop which is predetermined, automatic, and machine-controlled. As so construed, *held* not infringed by a machine in which the stop mechanism is manually controlled by the operator.

Appeal from the District Court of the United States for the District of New Jersey.

Suit in equity by the Reece Shoe Machinery Company against the United Shoe Machinery Company. Decree for defendant, and complainant appeals. Affirmed.

The following is the opinion of Haight, District Judge, in the court below:

This is a suit for infringement of patent No. 818,159, issued to William E. Goodyear on April 17, 1906, and now owned by the plaintiff. Both plaintiff and defendant, as their corporate names indicate, are engaged in the manufacture of shoe machinery. It is claimed that one of the machines manufactured and marketed by the defendant infringes the machine of the patent. It may be noted at the outset that it is not claimed that the plaintiff's commercial machine embodies the novel features of the patent, except that, as plaintiff's expert testified, it has some of the latter's "broad or general features"; the former being designed in accordance with patent No. 1,085,093, issued to A. R. Schoenky on January 20, 1914. According to the testimony of the president of the plaintiff company, the patent in suit was first brought to plaintiff's attention in the "spring of 1914," when it was engaged in developing its commercial machine, and was purchased because plaintiff was advised that it was "important" that it should own the same "to protect" its machine. The patentee was thereupon looked up. It was actually acquired from the patentee on April 10, 1914, by the Reece Buttonhole Machine Company, a concern closely affiliated with the plaintiff and engaged in manufacturing machines for which the device of the patent was primarily designed. It was, however. never used by that corporation. As far as the evidence shows, it was assigned by it to the plaintiff on May 1, 1914. On June 3d of that year this suit was instituted. For all that appears, it is a mere paper patent, never having been put to any practical use, although the patentee was at the time it was issued an employé of the Singer Sewing Machine Company. The object sought by the patentee, as set forth in the specifications, was "the production of stop motion for high-speed machines which will positively stop the mechanism at a predetermined position and without shock." Although the device was stated to be intended for use in connection with sewing machines, and particularly buttonhole sewing machines, the patentee claimed that it might be applied to any other form of sewing machines or to any machine to which the stop motion might be used "with advantage." The result accomplished, as stated in the specifications, is that the machine "may be gradually started and positively stopped, but before stopping its speed will be reduced so that the action of stopping will be without shock." Broadly stated, the device consists in attaching to a sewing machine two pulleys, connected by a system of planetary gears with the working shaft, which are designed to be operated by a single belt connected with the power source; the belt being shifted from one pulley to the other by a belt shifter, which operates automatically through a

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

series of levers; the latter being operated and controlled by a cam carried on a disk, which, in turn, is operated by the working shaft. In the particular device described in the specifications the disk is designed to make one revolution to a predetermined number of revolutions of the working or driven shaft. When the machine is at rest, the belt is connected with one of the pulleys which revolves idly, but when the belt is shifted to the other pulley, it operates both pulleys through the system of planetary gears, and the machine is then run at high speed. When the driven shaft has made the required number of revolutions and thus rotated the disk, the cam, through the levers, causes the belt shifter to shift the belt to the first mentioned pulley, and at the same time brings into play a brake which frictionally engages a collar connected with the second pulley, and thus holds the latter stationary. The effect of this, through the planetary gears, is to cause the first-mentioned pulley to operate the machine at a low speed, which bears a fixed relation to the working or high speed. After the driven shaft has made a given number of revolutions at a low speed, and has thus moved the disk and the cam further in their annular course, the cam, through the series of levers before mentioned, releases the brake from the second pulley, and thus disengages the low speed, and at the same time throws a dog stop, located on one of the arms of one of the levers, into engagement with a projection on the working shaft, and thus brings the whole machine to a positive stop at a predetermined position. It will be noted from the above description, brief and inartistic as it is, that the disengagement of the high speed and the introduction of the low does not depend in any way upon the action of the operator, although, conceivably, he could control them by keeping the pedal depressed so that the cam could not work until he saw fit to release the pedal. But in a machine to which the mechanism of the patent was primarily designed to be applied—a buttonhole sewing machine—it is not ordinarily desirable that the operator should exercise any control over the stoppage of the machine after he has once set it in motion, because the machine is designed to work around a buttonhole, and thus make a predetermined number of stitches and come to a stop. The defendant's machine, on the other hand, is designed and useful only for stitching the outsole to the welt of a shoe. As such work requires that the speed of the machine shall differ as to certain parts of the work, for instance, around the toe and along the ball of the shoe, it is necessary that the speed shall at all times be under the control of the operator and be variable. Moreover, as the sizes of the shoes to be sewed vary, it is also necessary that the stoppage of the machine shall be under the control of the operator. In these two respects, it will thus be seen, a buttonhole sewing machine and a machine such as defendant's materially differ. The variable speed feature of the defendant's machine is produced by a friction clutch, to which the operating treadle is connected, which permits the operator, by varying the pressure on the treadle, to produce a variable speed, dependent upon how firmly the faces of the friction clutch are pressed together. The degree of the speed is therefore entirely under his control at all times, and the machine can be stopped only by releasing the treadle or pedal. It is also important that the defendant's machine stop without shock and with the needle out of the work, as it is likewise in a machine such as the device of the patent was primarily designed to be attached to. To accomplish these latter purposes the defendant has incorporated in its machine the mechanism which the plaintiff alleges infringes certain claims of the patent in suit. This mechanism is, briefly, as follows: Attached to the main power shaft (to which also is connected the friction clutch through which power is transmitted to the driven or working shaft) is a pulley which revolves continually at a constant speed. This is connected by a belt with another pulley, which, in turn, through a shaft and worm gear, operates a worm wheel; the latter being loose on the working or driven shaft. Hence this worm wheel is always turning slowly, irrespective of whether the variable speed is in action or not, and at a constant speed. It has an internal cone friction face, which is designed to receive a cam wheel, having an external cone friction face, coupled to the driven shaft, so as to rotate therewith, but free to slide, to a certain extent, laterally thereon. While the high or working speed is on, this cam wheel rotates idly with the shaft

and performs no function. Extending around the shoulder of the cam wheel is an inclined or tortuous groove or track in which a cam roll is designed to travel. The latter is attached to one of the arms of a two-armed pivoted lever, the other arm of which is designed, by means of a socket at the end thereof, to engage a bolt which, through a system of levers, is connected with the treadle, and hence is under the control of the operator, being either depressed or permitted to rise, as he wills. While the bolt is held depressed, the two-armed lever and the cam roll simply vibrate and perform no function. However, when the bolt rises and registers with the socket, the lever is held stationary, with the result that the cam roll, when it meets the incline of the cam track, forces the exterior friction face of the cam wheel into engagement with the interior friction face of the worm wheel. Thereupon, the high or working speed having been disengaged by the releasing of the treadle, and the constant speed being continually in operation, the driven shaft to which the cam wheel is attached is operated at the constant speed of the worm wheel, until the cam roll has passed over the incline in the cam track, when the cone faces are brought out of frictional engagement, and the main shaft, being without power, revolves only through momentum. At the same time that the constant speed is disengaged a brake, through a series of levers operating through the cam, is applied to the main pulley connected with the driven shaft, and a dog stop comes into engagement with a projection on the main shaft and positively stops the machine, in case the brake has not already done so. It is thus obvious that the cutting off of the high speed is not dependent on the action of the cam, but solely on the will of the operator, as, in a broad sense, is also the introduction of the constant speed. In fact, the operator, after cutting off the high speed, may allow the machine to come to a·stop without the introduction of the constant speed; the main shaft can make no more than 1⅓ revolutions, and ordinarily does make only a fraction of a revolution. Both mechanisms are designed to effect a stopping of their respective machines by the introduction of a low speed between the cutting off of the high and the final stop. The essential difference between the stop mechanism of the patent as described therein, and that of the defendant's machine, is in the method by which they are respectively set in operation. The defendant contends, however, that there are other differences, besides those of mere form, which negative infringement. But if I were compelled to rest my decision upon any of them, I would have great hesitancy in finding that any, save possibly that relative to the character or functions of the respective cams, have that effect. To so hold would require a more narrow and restricted construction than to be given to the claims in suit than I am inclined to believe is warranted. The difference before mentioned is, however, vital, and, unless the claims in suit are entitled to a construction such as the plaintiff contends for, it is decisive. The claims alleged to be infringed are the first seven, 21, and 31. They can best be set forth by quoting No. 2 and pointing out the important differences, other than mere variations of expression, between it and them. It is as follows: "A stop motion, wherein means are employed to automatically reduce the speed of the machine before stopping it, and to continue the engagement of the driving power after the speed is reduced, such means being controlled by the machine."

Claim 1 uses the expression "means for positively driving it at a reduced speed to a predetermined stopping position," instead of the expression of claim 2 "to continue the engagement of the driving power after the speed is reduced." In other respects it is the same. Claim 3 contains the additional element "of means for driving the shaft at high speed" and "means for positively stopping the shaft." The expression of means "to automatically reduce the speed" is not used in this claim, or in 4, 5, or 6, but in each there is an element of means "for automatically (in some claims 'positively,' also) driving the shaft at a reduced speed, such means being controlled by the driven shaft" or "driven member." Claim 4 requires, in addition, means for "positively" driving the shaft at high speed, and the means for automatically driving it at a reduced speed are limited by the expression "to a predetermined stopping position." In other respects it is the same as claim 3. Claim 5 requires that the means for driving the driven member at high speed shall

be "disengageable"; also that there shall be means for "stopping the driven member," which shall comprise "means for automatically operating the driven member at a reduced speed." In other respects material to this inquiry it is the same as claim 3. Claim 6 requires a "positive stop" and "means for applying the stop after the driven member has been moved to a predetermined stopping position." The remaining three claims are more restricted than those just analyzed. They will be discussed hereafter. It will thus be noted that each of the first six claims requires either that there be "means for automatically reducing the speed of the machine (the driven member or driven shaft)" before stopping it, as in claims 1 and 2, or that there be "means for driving the shaft at a high speed" and "means for automatically driving the shaft (driven shaft or driven member) at a reduced speed," as in claims 3, 4, 5, and 6. It is also a requirement of each of these claims that the means for automatically reducing the speed or driving the driven shaft at a reduced speed, as the case may be, shall be "controlled by the machine," or the "driven shaft," or "driven member," according to the particular expression used. The word "automatically" and the element last mentioned were only inserted in the claims after the Patent Office had refused to allow them in their original form. The Mills patent, No. 728,269, covering a stop mechanism for sewing machines, was first cited against them. In an argument presented to the Commissioner of Patents the pertinency of this reference was contested on the ground that the stop motion of that patent would not "positively stop a machine at the desired position and without shock, for its operation entirely depends on the varying friction of a brake." It was also said that in the invention of the patent in suit the brake shoe did not stop the machine or have anything to do with stopping it, but that it was "a portion of the change speed mechanism." However, the claims were again rejected, but this time not on Mills, but on Richardson patent, No. 710,612, covering a shoe-sewing machine. The machine of this latter patent was fitted with a high and low speed mechanism, which would not permit the high speed to be thrown out without the low speed being thrown in, although it is conceivable that they might occur almost simultaneously. But the introduction of the low speed did not automatically bring the machine to a stop after a predetermined number of revolutions or otherwise, it being necessary for the operator to put additional mechanism (although a part of the change speed mechanism) into operation to effect stoppage. The change of speed was also under the control of the operator and dependent upon his action. However, when he disconnected the high speed, the low, immediately and without further action on this part, was thrown in, unless he completely released the pedal in the first instance, when the dog stop happened to be in a given position, in which case the low speed would really not take effect so as to make any appreciable difference in the stoppage operation, and the machine would be brought to a stop abruptly. That machine was designed to do exactly the same kind of work as the defendant's machine. The patentee then and without further argument amended the claims by inserting the word "automatically" in each of the first six claims (claim 2 having been added at the time of the first rejection). In the argument to support the allowance of the claims as thus amended it was said: "The first six claims have been amended to specify an automatic arrangement for driving the machinery at a reduced speed. The Richardson structure is not automatic. The shifting from one speed to the other is effected by means of a pedal." The claims in question were, however, again rejected on Richardson, the examiner, holding that the stop mechanism of that patent was automatic, because after the operator had removed his foot from the treadle the machine would automatically stop after a certain time. The patentee, while not admitting the correctness of that ruling, amended the claims by inserting the clause "such means being controlled by the machine" or "driven shaft" or "driven member," as the case may be. It was expressly stated that the last amendment was made in order to make the meaning of the word "automatic," as used in the claims, clear. Without attempting at this time to recite all of the argument then advanced to show that the Richardson device was not automatic, suffice it to say that a distinction was drawn between a "speed-shifting" mechanism controlled by the operator and one controlled by the "driven member" or "driv-

244 F.—29

en shaft." The claims were thereupon allowed. It will be noticed that the first two claims call for "means for automatically reducing the speed," while the next four do not in so many words, but require "means for automatically driving the shaft at a reduced speed." While the last four do not therefore expressly require as one of their elements the automatic introduction of the low or reduced speed, as the first two necessarily do, yet I think it clear that they impliedly do so. They each expressly require means for driving at a high speed and at a low speed. The use of the word "automatically" in connection with the means for driving the shaft at a reduced speed, when considered in the light of the Richardson patent, the other element of high-speed drive, the specifications, the fact that the means for driving at slow speed are to be controlled by the driven member, and that the patentee's solicitors, in their arguments before the Patent Office, insisted, as respects all of these claims, that the Richardson patent was not automatic because "the shifting from one speed to the other is effected by means of a pedal," and later, when explaining the meaning of "automatic," said that "the speed shifting means is controlled by the driven member," seems to necessarily imply that it was intended to include in the "means for operating at a reduced speed," at least the automatic throwing in of the low speed. If this is not the proper construction, the word "automatically" is mere surplusage; for the machine would necessarily continue to operate at the reduced speed so long as power was applied, after it had once been set in operation. Indeed, I do not think this conclusion is controverted. Therefore, for the purposes of the present inquiry, as will appear when the contentions of the respective parties are stated, there is no essential difference between any of the first six claims.

The plaintiff contends that the claims in question should be construed as applying only to the operation of the stop-motion mechanism after it has once been started, and as having nothing to do with its initiation—the throwing out of the high speed. Hence it is argued that the defendant's machine infringes because, after the high speed is disengaged, although this must be done by the operator, the stop motion is automatically initiated and thereafter controlled (i. e., the low speed thrown in and the machine operated at a reduced speed) by means which are the same or the equivalent of those of the patent (i. e., by the cam on the driven shaft). This conclusion would probably be sound if the premise were correct. The defendant, on the other hand, contends that a proper construction of the claims will not permit the elimination of the throwing out of the high speed, but that they must be construed to cover all movements from the throwing out of the high speed to the disengagement of the low. Hence it is insisted that the defendant's machine does not infringe, because the cutting off of the high speed is not automatic, but wholly under the control of the operator and dependent upon his action, as is also the introduction of the low speed. The decision of the question of the infringement of the first six claims depends, therefore, upon whether these claims are to be construed as applying simply to a mechanism which initiates a reduced speed after the high speed has been cut off, or whether they must be construed to include the whole series of mechanical actions necessary to effect a reduced speed, which, of course, must include the elimination of the high. That they cannot be properly given the construction that the plaintiff contends for seems to me clear. It will be borne in mind that the throwing out of high and the throwing in of the low in the machine of the patent, as described in the specifications, is accomplished wholly by the action of the cam on the driven member, whereas in defendant's machine the cam has nothing whatever to do with throwing out of the high speed; this being accomplished entirely by the operator, as in the Richardson patent. It is true that in the defendant's machine, if the operator completely removes his foot from the pedal at the same time that he disengages the high speed, the low speed will automatically take effect, as soon as the bolt registers with the socket on the two-armed lever, which carries the cam roll, and the latter has come in contact with the inclined part of the groove. In that sense the introduction of the low speed does not depend upon the action of the operator, but it is equally true that until the operator allows the bolt to rise and register with the socket the low speed will not take effect. It is clear, therefore, that

if the claims are to be construed as covering a mechanism substantially that described in the specifications, the stop mechanism of the defendant's machine is radically different from that of the patent. Plaintiff contends, however, that the claims should not be so limited, because the stop mechanism there described is that applicable only to a buttonhole sewing machine, which, as before stated, makes a predetermined number of revolutions, and that when applied to a machine which does not have that feature (the patent, by its terms, being applicable to any other form of sewing machine) it would manifestly require some action on the part of the operator to set the stop motion in operation, and hence that a construction should be given which will embrace the latter type of machine. With this construction I am in accord, providing it is possible to so construe the claims, and not at the same time cover an invention which the patent does not disclose. Merely because the specifications of a patent claim that the invention is applicable to machines other than that specifically mentioned does not make it so. It may be observed at the outset that it seems impossible to conceive of a stop mechanism which does not include a means for the throwing out of the high speed; for until the high speed is eliminated no stop motion can be put in operation. The throwing out of the high speed may be done automatically by the machine, as described in the specifications of the patent in suit, or by the action of the operator in releasing the pedal, as in the defendant's machine. As before shown, the claims of the patent require that the introduction of the low speed shall be automatic. Can the claims, however, in the light of the specifications, the prior art, and the patentee's own interpretation of the meaning of the word "automatically," as used therein, when prosecuting the claims before the Patent Office, be construed as entirely eliminating the high-speed throwout? Such a construction would disregard the "speed-shifting" feature, which is the very thing which the patentee contended before the Patent Office was, in his mechanism, automatic, and which in Richardson was under the control of the operator. In his last argument he said "the speed-shifting means is controlled by the driven member" and thus "the definition of 'automatic' is made very clear." Speed shifting necessarily implies a change from one speed to another. Such change, according to the patentee, was to be automatic—i. e., controlled by the driven member. A change of speed which does not eliminate one speed before introducing another is inconceivable. Further, in defining why the Richardson machine is not automatic, he said that, if the operator should take his foot off the pedal when the machine was running at a high speed, the stop would be put on before the driven shaft could make a complete revolution, and therefore the effect of the low speed would not be secured. In the machine of the patent, if the operator should keep his foot on the treadle, so that the cam could not work until the treadle was released, and if at the time the cam was in such a position as to immediately release the actuating lever, and thus simultaneously throw out the low speed, there would be the same result as the patentee pointed out in respect to the Richardson patent; for in that case, the machine would be brought to a stop by the disengagement of the high speed without the low having really taken effect at all. It is only when the cutting off of the high speed and the introduction of the low is placed under the control of the machine and taken out of the control of the operator entirely that the machine of the patent will produce the result which the patentee claimed differentiated it from and made it more desirable than the mechanism of Richardson. If the high speed cut-off is no part of the stop motion of the patent, why was "means for driving the member at high speed" included as an element in every claim in which "means for automatically reducing the speed" was not present? Means for reducing speed necessarily presuppose that a high (in a relative sense) speed precedes the reducing process. As before stated, such a process which does not include the elimination of the high speed is not readily imaginable. While I do not find it necessary to hold, as the defendant seems to contend, that the claims should be construed to cover only a mechanism in which the number of revolutions which the driven shaft is to make has been predetermined, therefore excluding any act of the operator after the machine has once been set in operation, still, for

the reasons before stated, I think they must be construed to exclude a mechanism in which the cutting off of the high speed is not accomplished by machine, but directly by the operator. For instance, if in the device of the patent the treadle were released shortly before the cam came in position to actuate the series of levers, the cam would then throw out the high speed, introduce the low, and operate the machine for a certain number of revolutions at a reduced speed, and then disengage the latter. But in such a case the cutting off of the high speed, and so forth, would be automatic in the sense that the cam on the driven member would actuate the machinery necessary to accomplish this result. Such a mechanism would be different from that of Richardson, because in the latter the action of the operator directly disengages the high speed, whereas in the mechanism of the patent he would simply set in operation certain mechanism which, after a given time, would disengage the high speed. There is thus a conceivable distinction, fine though it is, between Richardson and the device of the patent, if the latter is construed to cover a mechanism in which the operator does something more than start the machine in operation. But this very distinction also applies to the defendant's machine quite as forcibly as it does to Richardson. Consequently it seems clear, whether the claims of the patent are to be considered as applicable only to the device described in the specifications or as to one such as I have above supposed, that they must be construed as covering only a mechanism in which the throwing out of the high speed, and hence the introduction of the low is controlled by the machine as distinguished from the operator. As the defendant's stop mechanism is not automatic in that sense, it follows that it does not infringe these claims. The importance which I have attributed to the arguments of the patentee's solicitors, which appear in the file wrapper, is not opposed to the rule that a fair construction shall be given to the claims as actually granted, although limitations have been inserted therein by amendment. Hubbell v. United States, 179 U. S. 77, 80, 21 Sup. Ct. 24, 45 L. Ed. 95. The word "automatic" and the clause "such means being controlled by the machine" or "driven member," etc., were express limitations, and the patent can receive no construction which would nullify them or either of them. I have simply resorted to the file wrapper to ascertain the meaning which should be given them. Certainly a fair construction would not be one at variance with the sense in which they were understood by both the patentee and the Commissioner of Patents. Their meaning as used is certainly ambiguous, especially in view of the plaintiff's contentions. In addition, while the patent in suit is not invalid simply because it is a paper patent, and while it is entitled to the benefit of a fair range of equivalents, yet, being a paper patent, it is not entitled to a construction broader than the claims clearly require or than the invention which is clearly disclosed therein. Bradford v. Belknap Motor Co. (C. C. Me.) 105 Fed. 63, 64; Boston, etc., Rubber Co. v. Pennsylvania Rubber Co., 164 Fed. 557, 90 C. C. A. 84 (C. C. A. 1st Cir.); Lovell v. Seybold Mach. Co., 169 Fed. 289, 290, 94 C. C. A. 578 (C. C. A. 2d Cir.); Westinghouse, etc., Co. v. Toledo, etc., Co., 172 Fed. 371, 372, 97 C. C. A. 69 (C. C. A. 6th Cir.); Kestner Evaporator Co. v. American Evaporator Co. (C. C. E. D. Pa.) 182 Fed. 844, 846. See, also, remarks of Mr. Justice Brown in Deering v. Winona Harvester Works, 155 U. S. 295, 15 Sup. Ct. 118, 39 L. Ed. 153. I have made no reference to either the Shearn patent, No. 728,775, or to the Hartford patent, No. 579,870, which are also relied upon by defendant, and which, I think, are not without some pertinency on the question of construction of the claims. Claim No. 7 was inserted at the time of the last amendment to the other claims. It contains as an element "means for automatically reducing the speed of a machine a predetermined number of revolutions before stopping." Passing the question as to whether the defendant's machine, within the meaning of the patent, reduces the speed "a predetermined number of revolutions before stopping," this claim is not infringed, because, for the reasons before stated, the defendant's machine has no means for "automatically" reducing its speed within the meaning of the patent. The word "automatically" is not found in claim 21, but that claim does contain as elements: (1) "Means for positively rotating the shaft (driving) at the working (high) speed;" (2) "means for

rotating the shaft at a slower speed;" (3) "means for stopping the shaft;" and (4) "the last two means being controlled by the movements of the cam." The cam is not required to be attached to the shaft, but is merely to be "moving in time therewith." It would seem that the last element impliedly includes an automatic speed-shifting feature such as the other claims, although possibly of a more limited nature. That the speed-shifting feature shall not be under the control of the operator is of the very essence of invention. The patent is not entitled to a construction broader or different than the invention disclosed therein. As before pointed out, defendant's machine does not have that feature. Unless the claim is construed in this light, it would seem to be within the Richardson patent. In addition, I think that it is anticipated by the Shearn patent. The latter has all of the elements of the claim. Admittedly claim 31 is not infringed, unless the element of the "lever carrying means for applying the brake" refers to the overhanging end of the lever, of the machine of the patent, which has the notch adapted to engage with the projection on the driven shaft and stop the machine. The specifications make no mention of the overhanging projection of this lever having any braking or other effect whatever. The only "brake" referred to in the specifications is that which arrests the progress of the high-speed pulley, and which is spoken of as a "brake shoe." It would be quite unjustifiable to read into the paper patent, for the purpose of spelling out an infringement, a function of one of the parts to which the patentee made no reference in his specification. Ball & Socket Fastener Co. v. Kraetzer, 150 U. S. 111, 117, 14 Sup. Ct. 48, 37 L. Ed. 1019. In addition, if the construction contended for by the plaintiff is correct, it is indeed strange that the lever would not have been described as having itself a braking action rather than as one "carrying means for applying the brake." The latter expression in itself indicates a separate and distinct piece of machinery. I think it clear, therefore, that this particular element refers, not to this overhanging projection, but rather to the roller, which puts into operation the brake, which, in turn, arrests the progress of the high-speed pulley. But that brake, as the patentee, in his argument before the Commissioner respecting the pertinency of the Mills patent, distinctly said, has nothing whatever to do with the stopping of the machine, but is "a portion of the change speed mechanism." Construed in this light, the defendant's machine has no such element or counterpart. The brake on the defendant's machine has nothing to do with the change of the speed mechanism, but comes into play only after the low speed has been thrown out and for the purpose of stopping the machine.

As before stated, I have not attempted to discuss all of the differences between the defendant's machine and that of the patent which the defendant contends negative infringement, or the arguments advanced on its behalf in respect to lack of novelty, because it seems to me that the case may be properly disposed of on the points heretofore discussed. My conclusion is that the bill should be dismissed with costs.

Rogers, Kennedy & Campbell, of New York City (Livingston Gifford and Donald Campbell, both of New York City, of counsel), for appellant.

Frederick P. Fish, Alfred H. Hildreth, and J. L. Stackpole, all of Boston, Mass., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the Reece Shoe Machinery Company, the owner of patent No. 818,159, granted April 17, 1906, to William E. Goodyear, for a stop motion for high-speed machines, charged the United Shoe Machinery Company with infringement. On final hearing that court held infringement was not

established. From a decree dismissing its bill, the plaintiff took this appeal.

Having had the benefit of a full and helpful discussion of this case by competent counsel, and after careful study of the briefs and records, we see no reason to differ from the conclusion reached in the court below. In view of the thorough and painstaking discussion by the judge, an opinion by this court describing the complicated machines involved could but be an effort to state in different language what has been already placed on record in the opinion of the judge below. We avoid useless repetition by reference to that opinion, and limit ourselves to a general statement of the conclusions to which we have been led by our study of the case. Those conclusions may be thus summarized:

First. The general subject here involved is the abrupt stoppage of sewing machines driven at high speed.

Second. In such machines there are two varieties and two modes of operation, viz. a cyclic machine, or one that repeats a certain unvarying routine in each operation, and therefore automatically stops at a predetermined point after sewing a certain number of stitches at uniform speed. The other is a noncyclic machine in which there is no cyclic finish and cyclic repetition, but which sews at varying speed and with varying numbers and lengths of stitches, all at the will of the operator.

Third. In the first type there is a machine-controlled, automatic, predetermined stop. In the other the stop is made when the operator wills.

The device of Goodyear was of the former kind, and in his specification he applied it to a machine for sewing the edges of buttonholes. In that respect his specification says:

"The object I have in view is the production of a stop motion for high-speed machines, which will positively stop the mechanism at a predetermined position and without shock. The invention is intended for use in connection with sewing machines, and particularly buttonhole sewing machines, which must be stopped in a certain and definite position. The invention, however, may be applied to other forms of machinery, as is found desirable. * * * It is to be understood that the illustration of this particular sewing machine [E. B. Allen, patent No. 785,061, of March 14, 1905] is solely for the purpose of describing the invention, as the invention of the stop motion may be applied to any other form of sewing machine or to any machine to which the stop motion may be used with advantage."

Showing the cyclic type of the device and the machine-effected, automatic stop, the specification says:

"A cam, 5, carried by a disk 6, which is turned by the machine and which makes one revolution while a buttonhole is being completed, is provided. This cam is designed to engage with mechanism for shifting the belt from one pulley to the other and applying the stop motion."

Without entering upon a detail description of the various operative parts, it suffices to say that the cyclic operation centers in said cam, 5, which is illustrated in this drawing,

—and that by the engagement of a finger with the cam there is in the mount on the first incline an automatic, predetermined shift from high to low speed. This is followed, on the level plane, by a predetermined period of low speed. Then follows, by the mount on the second incline, an automatic, predetermined throwout of the low speed and the automatic throwin of the dog stop at a predetermined, unvarying point. It will thus be seen that the cam and engaging finger produce a continuous, indivisible, mechanical operation by which the machine automatically goes from high to low speed and from low speed to a predetermined, regularly recurrent stop.

In the progress of Goodyear's application through the Patent Office, his claims were rejected on reference to patent No. 710,612, of October 7, 1902, to Richardson, for a shoe-sewing machine. Without describing the mechanism of that machine, it suffices to say it had a high-speed drive, a change from high speed to low under the control of the operator, and thereafter an operative stop at a desired, predetermined position. Goodyear recognized that Richardson embodied his pending claims,[1] and he therefore differentiated his device by showing that Richardson's shift speed was made by the operator while his own was automatic and made by his machine, and narrowed his claims by limitation to automatic action. In that regard the file wrapper shows Goodyear said:

"The first six claims have been amended to specify an automatic arrangement for driving the machinery at the reduced speed. The Richardson structure is not automatic. The shifting from one speed to the other is effected by means of a pedal."

---

[1] E. g., claim 1: "A stop motion wherein means are employed for reducing the speed of the machine before stopping it and means for positively driving it at a reduced speed to a predetermined stopping position."

' Even this amendment, viz. by inserting the limitation automatically, did not satisfy the Office, and to meet its further objection Goodyear added to his claim the limitation "such means being controlled by the machine," saying:

"By including in the claims the specific statement that the speed-shifting means is controlled by the driven member, the driven shaft, or whatever is specified in the claims, the definition of 'automatic' is made very clear."

The result was to make the claim read as follows, the words in italics being those thus added under stress of the Office's insistence:

"A stop motion, wherein means are employed for *automatically* reducing the speed of the machine before stopping it, *such means being controlled by the machine*, and means for positively driving it at a reduced speed to a predetermined stopping position."

From this it will be seen that Goodyear's machine was a routine, cyclic one, and that means controlled by the machine automatically stopped it at a predetermined point. The particular machine used by Goodyear shows that his type of stop motion was applicable to a buttonhole sewing machine, and the stop requirements of such a machine illustrate generally the scope, character, and limitations of Goodyear's stop motion. As the machine was operated at high speed —some 1,500 stitches a minute—and as the stitches in the buttonhole were confined to a certain number, it is obvious that mechanically the machine was intended to automatically stop when the required buttonhole stitches were made, and the high speed of the machine mechanically required that at that instant the cycle-ending stop be made by the machine itself. To have allowed the sewing to have gone further would have ruined the buttonhole, and to have the stop made by the operator, if indeed it could be made even by a highly skilled operator at such speed, would have been a backward step in the developed buttonhole sewing art.

It will therefore be seen that in the statements of the specification, in the enforced limitation of the claims, and in the everyday working of the art, the Goodyear disclosure was for a stop that was predetermined, automatic, and machine-controlled. Moreover, as Goodyear's device was never used in practice, and left no impress on the art, there was no occasion for the exercise by the court below of that liberality of claim construction made where a highly meritorious invention might otherwise be shorn of patent protection by the literalism of a claim.

Turning, therefore, from this claim-restricted and unused device of Goodyear's to the defendant's sewing machine, we have one that does a type of nonuniform work, namely, the stitching of shoe soles, which necessitates the judgment and absolute control of an operator. It is also to be noted that the machine of the defendant has been in wide, general use, without patent challenge, and it was only after a rival manufacturer purchased the dormant Goodyear patent that this belated charge of infringement is made. Without entering into the details of the defendant's machine, we may say that it is used for sewing the soles of shoes; that such soles differ in size; the sewing is done by a skilled operator who slows down the speed as he turns bends and uses stitches of different length at different parts of the

sole. In the nature of things, there must be operator control, operator skill, and operator volition in defendant's machine. In the nature of things, there can be no fixed number of stitches, no uniformity of speed, and no predetermined place or time of stop. Not only the absence of an automatic, machine-controlled stop in defendant's machine, but the varied character of the work done, precluding the possibility of the use of a predetermined stop, unite to make the defendant's machine of a wholly different type from Goodyear's. The mere fact that defendant's machine goes from high speed to low speed and that the needle stop is made at such low speed does not stamp the stop motion as Goodyear's. He has no claim, and in the nature of things he could have none, for the mechanical step of slow-speeding a machine before dog-stopping it. That is a mechanical practice and truism as old as physics, and which no patentee could monopolize. Of such speed reduction the defendant avails itself to stop its machine without shock, but this it had the right to do. It is also true that its machine is stopped when the needle is out of the fabric, and in that sense the stop is predetermined. But it will be observed that, while the mechanism is such that when the machine does stop the needle shall be in a certain relation, still this fixed condition when the operator chooses to stop it is a wholly different mechanical feature from a machine automatically stopping itself at a predetermined cyclic point. In the one case the automatic, machine-controlled stop is unchangeable; in the other the optional, human-controlled stop is variant. In both there is slow speed and a super-fabric needle stop, but Goodyear did not disclose or claim a slow speed stop of a needle in a superfabric position. Confining ourselves to the foot brake mechanism of defendant's machine, its working will appear from the accompanying sketch.

## Defendant's Machine
## Treadle control.

Starting with the machine at such working high speed as the operator desires, he releases his foot treadle, and thereby disengages a clutch through the engagement of which the high-speed driving device drives the main shaft. But even such disengagement of the high-speed clutch does not per se throw in the low-speed clutch; for the operator may allow the machine to run by momentum. To throw in the low-speed clutch, the operator must release the treadle still further. It will thus appear that, while the throwing out of the

high speed is a condition precedent to throwing in the low speed, it is not the causal agency, but the operator is, of throwing in the low speed. It follows, therefore, that the shift from high speed and the shift to low speed in the defendant's machine have no dominant or servient relation to each other as they necessarily have in the Goodyear cam, but that between the two independent speeds stands the personality and dominant volition of the operator.

After full consideration we are of opinion that, passing the question of validity, on which we express no view, the charge of infringement has not been established, and the decree below must be affirmed.