### GENERAL CHEMICAL CO. v. SELDEN CO.

No. 2358.

District Court, W. D. Pennsylvania.

June 17, 1932.

Pennie, Davis, Marvin & Edmonds, W. B. Morton, and Frank E. Barrows, all of New York City, and Harry S. Dunmire and R. T. M. McCready, both of Pittsburgh, Pa.; for plaintiff.

Clair W. Fairbank, of New York City, Robert Ames Norton and Ralph D. McKee, both of Pittsburgh, Pa., and S. A. Demma, of New York City, for defendant.

McVICAR, District Judge.

The court finds the following facts and makes the following conclusions of law:

(1) The plaintiff, the General Chemical Company, is a corporation of the state of New York. The defendant, the Selden Company, is a corporation of the state of Delaware, having an established place of business in Pittsburgh, Pa., where the acts complained of are alleged to have been committed.

(2) The patent in suit is No. 1,371,004 for certain new and useful improvements in oxidation of sulfur dioxid and catalyst therefor. The patent states that it relates to the production and use of a commercially efficient catalyst or contact substance for the production of sulfuric anhydrid from sulfur dioxid and oxygen. The patent was applied for October 9, 1914, and was granted March 8, 1921, to the plaintiff, the assignee thereof, who has continued since to be its owner. The issues are validity and infringement.

(3) Prior to the patent in suit the only successful commercial catalyst in use was platinum on an asbestos carrier.

(4) It is stated in the patent in suit that the De Haen patent, No. 687,834, described a substance of the general class of vanadium catalysts; however, the product of that patent does not convert more than 84 per cent. of the sulfur dioxid into sulfuric anhydrid, which makes it useless for commercial purposes.

(5) In referring to the invention claimed in the patent in suit, it is stated:

"Broadly considered, this invention consists in providing a carrier for a vanadium

containing substance, which carrier has a fineness of division very much greater than that of similar carriers heretofore employed. So far as we are aware no vanadium catalysts have been used or described in which the carrier was less than 5,000 microns in maximum dimension. As such carriers we have used ground pumice, kieselguhr, precipitated silicic acid, stannic oxid, or stannic hydroxid, or mixtures of all or any of them; we prefer to employ these materials of a degree of fineness such that the individual particles do not exceed twenty microns and are preferably in the neighborhood of one micron in diameter, although we are not limited to degrees of fineness falling within such limits, as coarser particles of carrier may be used and a large increase of conversion still be obtained. When we speak in our claims of a carrier very finely divided we mean to indicate a carrier in the here defined finely divided form, that is to say so much finer than those hitherto employed for vanadium catalysts that the catalyst of which it forms a part produces or is suited to produce, a commercially substantial increase of conversion over those hitherto known; but not so coarse that it is not capable of granulation. Particles of carrier should, therefore, not have a diameter larger than sixty (60) microns."

(6) In referring to collateral or subsidiary steps in the making of the catalysts, it is stated in the patent in suit that—

"In developing this feature of the invention we have discovered several collateral or subsidiary new steps in the production of a suitable vanadium catalyst: for example, the addition of potassium hydrate or sodium hydrate, or the carbonate or the sulfate or the nitrate of these, in order to protect the new catalyst from deteriorating in catalytic activity; finally, the removal of hygroscopic properties by heating such catalyst in the presence of air and in the absence of sulfur dioxid."

(7) As to the form of the vanadium in the patent in suit, it is stated:

"The form in which we use the vanadium may be that of vanadic oxid or of ammonium vanadate, or of potassium vanadate, with or without, as the case may be, the addition of potassium or sodium hydrate, carbonate, sulfate, or nitrate, so as to stabilize the catalyst by overcoming any hygroscopic properties which it may possess."

The patent in suit also states that a suitable binding agent may be used.

(8) Two examples of carrying the invention into effect are given in the patent in suit. They are:

"Example 1: Mix 200 parts of moist pumice powder (the grains of which have a diameter of one micron) with 14 parts of ammonium vanadate; granulate this mixture and heat the resulting granular product to about 300° C. in the presence of air until ammonia is no longer given off, and then heat to 440° C. in the presence of gas containing or consisting of sulfur dioxid, until substantially no further change in the condition of the particles takes place. This product is now ready for use as a catalyst in the production of sulfuric anhydrid from gases containing sulfur dioxid and oxygen in the usual contact or catalytic process. Any other suitable carrier may be used in place of the pumice if in sufficiently finely divided condition.

"Example 2: Mix 316 parts of kieselguhr (either as it occurs in nature or after trituration) which may previously have been heated to a red heat, with an aqueous solution of 50 parts ammonium vanadate and 56 parts of potassium hydrate; thereupon evaporate off so much of the water that the remainder can be formed into granules; place this result in a furnace and heat at 480° C. with gas containing sulfur dioxid and oxygen (such as can be obtained from a pyrites burner) and then, if desired, continue the heating for some time in a current of air; the product of this operation is a catalytic agent which is ready for use in the same manner as the product in Example 1."

"The catalyst produced by Examples 1 and 2 is employed for the manufacture of sulfuric anhydrid in the usual manner, namely by bringing into contact with it both sulfur dioxid and oxygen."

(9) The claims of the patent in suit, eight in number, are:

"1. As a new composition of matter, a catalytic agent containing vanadium in chemical combination distributed on a very finely divided carrier not exceeding sixty microns in diameter.

"2. As a new composition of matter, a shaped catalytic agent containing vanadium in chemical combination distributed on a very finely divided carrier not exceeding sixty microns in diameter.

"3. As a new composition of matter, a catalytic agent containing vanadic oxid distributed on a very finely divided carrier not exceeding sixty microns in diameter.

"4. As a new composition of matter, a catalytic agent containing vanadic oxid and potash distributed on a very finely divided carrier not exceeding sixty microns in diameter.

"5. The improvement in the art of making sulfuric anhydrid which consists in causing sulfur dioxid and oxygen to come into contact with a catalytic agent comprising vanadium in chemical combination distributed on a very finely divided carrier not exceeding sixty microns in diameter.

"6. The improvement in the art of making sulfuric anhydrid which consists in causing sulfur dioxid and oxygen to come into contact with a catalytic agent comprising vanadic oxid distributed on a very finely divided carrier not exceeding sixty microns in diameter.

"7. The improvement in the art of making sulfuric anhydrid which consists in causing sulfur dioxid and oxygen to come into contact with a catalytic agent containing vanadic oxid and potash, which agent has previously been heated in the presence of air and in the absence of sulfur dioxid.

"8. The improvement in the art of making a catalytic agent which comprises treating a very finely divided carrier not exceeding sixty microns in diameter with a salt of vanadic acid and then heating the same in the presence of air and in the absence of sulfur dioxid."

(10) The application for the patent in suit was amended without affidavit and the signatures of the applicants by insertion in the specification and claims a limitation to the size of the particles in the carrier so that they were not to exceed "sixty microns in diameter."

(11) The inventors of the patent in suit were two employees of the Badische Anilin & Soda Fabrik, a German company. They assigned the patent in suit to the plaintiff on the date of the application therefor in this country.

(12) In 1915 the Badische Company, in Germany, began using the invention commercially in substantially the form of example 2, of the patent in suit, and by 1918 one-quarter of the total sulfuric acid production of that company, which was a large producer, was produced by the vanadium catalyst instead of the platinum catalyst formerly used. This use continued until 1922 or 1923. The use ceased then because vanadium was not available. In 1924 vanadium was available. The Badische Company then began a systematic recharging of its converters. In 1928 all of the converters of the Badische Company and affiliated companies were using vanadium substantially in conformity with example 2 of the patent in suit. The conversion efficiency was from 96 to 97 per cent.

(13) Nothing seems to have been done by plaintiff to determine the merits of the patent in suit until 1917. At that time Professor Wilfred W. Scott, an employee of plaintiff, was directed to compare the De Haen vanadium catalyst and the catalyst in suit for the purpose of determining their relative efficiencies as compared with the platinized asbestos catalyst for the conversion of sulfur dioxid and oxygen into sulfuric acid. Scott reported an efficiency of 86.2 under normal loading, which would make the catalyst commercially useless.

(14) In 1927 plaintiff made an examination of some vanadium catalysts including a catalyst of Dr. Jaeger, which he sold to the Monsanto Chemical Company, which gave a conversion of 96 to 97 per cent. In 1928 plaintiff received samples of defendant's catalysts and made tests thereof.

(15) Plaintiff has used the vanadium catalyst of the patent on an increasing scale in its commercial manufacture of sulfuric acid beginning in June, 1929, when it recharged one of its converters, previously charged with a platinum contact mass, with the vanadium contact mass of the patent; in March, 1920, after this suit was brought, plaintiff charged a second converter with the contact mass manufactured in exact accord with example 2 of the patent in suit, and additional converters have been charged with the catalyst of the patent since that time; and all of these converters have been in successful commercial operation with a percentage conversion and efficiency equal to or better than the best results obtainable with the platinum contact mass and with the percentage conversion of 96 per cent. or more described in the patent.

(16) The patent in suit contains a description of how the new vanadium catalyst can be manufactured for commercial use, and, in particular, it gives in example 2 the process that has been, in substance, used commercially by the Badische Company since 1915, and also by the plaintiff, and gives all the information necessary for the successful manufacture of such catalyst. In addition, example 1 gives all the information necessary for the production of a successful catalyst.

(17) In making the catalyst in accordance with example 2 of the patent, part of the potassium hydrate reacts with the kieselguhr to form potassium silicate on the surface of the kieselguhr particles, and this potassium silicate acts as a binder for the kieselguhr particles when the catalyst is formed into granules or pellets.

(18) During the calcining or sulfating of the granulated or pelleted catalysts of example 2 by placing the catalyst in a furnace and heating at 480° C. with gas containing sulfur dioxid and oxygen, the potash content of the catalyst is converted into potassium sulfate which is present in the finished catalyst to the extent of about 20 per cent. of the catalyst.

(19) Defendant, since the fall of 1927, has been making a vanadium catalyst for conversion of sulfur dioxid and oxygen into sulfuric acid. The ingredients and process of the making of defendant's catalysts are substantially as follows:

A water solution of potassium silicate is sprinkled on superfloss, otherwise known as kieselguhr, wetting the surfaces of the particles, and they are thoroughly mixed for one-half an hour by rolling, raking, and shoveling.

Aluminum hydroxid is made from aluminum sulfate and ammonia, and this aluminum hydroxid is transformed into potassium aluminate by the addition of potassium hydroxid.

A water solution of this potassium aluminate is then sprinkled on the potassium silicate and superfloss mixture and the product is thoroughly mixed for one-half hour by rolling, raking, and shoveling. The potassium aluminate unites with the potassium silicate to form a zeolite which is a potassium aluminum silicate of jellylike consistency. The mass is forced through a screen to form it into lumps of zeolite containing and diluted by superfloss particles. The potassium aluminate and potassium silicate are added in the proportion of two combining parts of the former to five combining parts of the latter to form the zeolite gel.

A complex vanadium compound is prepared by adding ammonium vanadate to potassium aluminate and potassium hydroxid in the proportion of one combining part of potassium aluminate to three combining parts of ammonium vanadate.

This complex vanadium compound, in the form of a thick gelatinous suspension just capable of being poured, is poured on the lumps of zeolite diluted with superfloss and is mixed to only a slight extent, without penetrating the zeolite jelly.

The coated lumps are compacted between rollers, then forced through a screen to separate them into small lumps, and then compacted into pellets.

Prior to filing the bill of complaint, and for a short time thereafter, these pellets were delivered directly to the users without being treated with sulfur dioxid, and without any further treatment other than mere drying. Beginning some time after the filing of the bill of complaint, the defendant has formed its pellets in a Stokes pill machine, and to prevent sticking in this machine has added a small amount of stearic acid as a lubricant before pelleting. It has then calcined or sulfated the pellets by heating with a very. dilute mixture of air and sulfur dioxid containing about 1 per cent. sulfur dioxid, gradually increasing the amount of sulfur dioxid until the pellets are gradually but thoroughly calcined. After the calcining the pellets have been cooled with a blast of cool air through the calciner to reduce the temperature from about 500° C. to a temperature at which the pellets can be removed. They are then packed in air-tight containers and delivered to the users.

(20) In defendant's process of manufacture:

No vanadium compound is applied to the superfloss.

A zeolite, which is a jellylike substance, is formed in the presence of the superfloss by first applying the potassium silicate and then the potassium aluminate, these two uniting to form the potassium aluminum silicate jelly or zeolite.

The lumps of zeolite, while still damp and having the superfloss embedded therein, are screened to break them up into smaller lumps. These lumps are larger than 100 microns in diameter.

At the time the complex vanadium compound is applied to the zeolite lumps, the zeolite is in the form of a moist gel with no empty pores into which the thick gelatinous suspension of the vanadium compound can enter.

The vanadium compound forms coating or layers which in some cases surround the lumps and in other cases may be on only a portion of the surface.

In calcining, the chemical composition of the zeolite is somewhat altered, but it retains its porous integral character and there

is no breaking up of the lumps, as the vanadium compound remains as a coating on the porous lumps and is not distributed on the superfloss particles or on any carrier in a very finely divided condition, or of 60 microns or less in diameter.

(21) Defendant has never heated its catalyst with air in the absence of sulfur dioxid after the heating or calcining with sulfur dioxid.

(22) Defendant does not use potassium, sodium, or other alkali metal compound to protect its catalyst from deteriorating in activity.

(23) Plaintiff's vanadium catalyst and defendant's catalyst have the following advantages over the prior art platinized asbestos catalyst, which was the only efficient commercial catalyst prior to the catalyst in suit: (a) Cheaper as compared to the high cost of platinum; (b) not poisoned by arsenic, clorine, and other impurities in the sulfur, pyrites, or other raw materials employed; (c) higher conversion of the sulfur dioxid passed through the converter; and (d) not damaged by dirt and dust or by moisture.

(24) Plants costing about $6,500,000 have been built for the use of defendant's catalyst, which have a capacity of over 1,500 tons of 100 per cent. sulfuric acid per day.

(25) From January 1, 1926, to January 1, 1929, vanadium catalyst has been installed in sufficient amount to manufacture 415,000 tons of 100 per cent. acid per year, none of which was installed by the plaintiff. During that period plaintiff installed platinum catalyst sufficient to make 103,000 tons of 100 per cent. acid per year.

(26) Between January 1, 1929, and October 1, 1931, sufficient vanadium catalyst has been installed to manufacture 350,000 tons of 100 per cent. acid per year, and, of this, 30,000 tons were installed by plaintiff.

(27) Defendant's catalyst has a conversion efficiency of 98 per cent. and over under normal loading of 135 liters of 7 per cent. gas per hour per 200 cc. of catalyst, and, even when the loading is increased to 185 liters, the conversion shows no drop. The overload capacity of defendant's catalyst is markedly better than that with platinized asbestos when tested in the laboratory.

(28) Plaintiff's KFI catalyst shows an average conversion of 94.76 per cent. in commercial operation under 103.1 per cent. of load, and plaintiff's Slama & Wolf example 2 catalyst gives an average conversion of 91.62 per cent. at an average load of 101.8 per cent. and an average conversion of 96.8 per cent. when operating under an average load of 65 per cent., whereas defendant's catalyst gives 97.89 per cent. conversion under 101.8 per cent. loading.

(29) Defendant's catalyst has given such satisfaction in commercial use that many users have ordered additional plants.

(30) Defendant's catalyst, when removed from a converter after long-continued use and tested in the laboratory, has never shown any drop in conversion efficiency from the normal 98 per cent.

(31) Prior to the invention of the patent in suit, it had not been discovered that a carrier made up of particles having a size of less than 60 microns, and preferably of 20 microns or less, possessed advantages over carriers such as asbestos and fragments of pumice, described by De Haen, and that by the use of such a carrier a commercial conversion could be obtained comparable with that obtained with the use of asbestos as a carrier for platinum.

(32) Catalytic chemistry is an empirical science, and it is not possible to predict or reason by analogy what results will be obtained with different catalysts or with different carriers.

(33) The fundamental discovery disclosed by the patent in suit was that, if the vanadium was distributed on a carrier made up of very finely divided particles of pumice or kieselguhr, the particles preferably having a size of 20 microns or less, the 84 per cent. uncommercial conversion of De Haen could be increased to a commercial conversion of 96 per cent. or more.

(34) The inventors of the patent in suit were the first to discover that the addition of a potassium compound, in addition to the vanadium compound, in making such a vanadium catalyst for the contact process, was of value and advantage in such a catalyst and in particular that it protected the catalyst from deteriorating in catalytic activity.

(35) The patent in suit is not anticipated by United States patents 687,834, C. J. E. De Haen, December 3, 1901; 1,102,670, Keler & Weindel, July 7, 1914 (granted on application 775,363, filed June 23, 1913); British patent 4308/74, A. M. Clark; and German patent 4566, Clemen Winkler 1878.

(36) Notice of infringement of patent in suit was served on defendant by plaintiff June 13, 1929.

### Conclusions of Law.

(1) All of the claims of the patent in suit are valid except claim No. 7, which is invalid.

(2) Defendant has not infringed the valid claims of the patent in suit.

(3) The bill should be dismissed at the costs of the plaintiff.

### Decree.

And now, to wit, this 17th day of June, 1932, this cause came on to be heard at this term, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows: That the bill in this case be dismissed at the costs of the plaintiff.

### Opinion.

█ Sulfuric acid, since the earliest history of the chemical industry, has been the basis for the manufacture of a large number of other chemical products. Strong sulfuric acid is vital to the manufacture of many chemicals, such as explosives and dyes. Strong sulfuric acid can be made economically only by the contact process.

Platinized asbestos was the standard catalyst at the time of the application of the patent in suit, October 9, 1914, for the conversion of sulfur dioxid and oxygen into sulfuric acid. It continued to be the standard commercial catalyst until 1927. In that year the Monsanto Chemical Company and the defendant put on the market a vanadium catalyst. Since 1927 the vanadium catalyst has largely superseded the platinum catalyst. Plants, which cost about $6,500,000, have been built for the use of defendant's catalyst. These plants have a capacity of over 1,500 tons of sulfuric acid per day.

Plaintiff did not make the vanadium catalyst specified in the patent in suit until June, 1929. Since that time it has increased the use thereof and replaces its platinum catalyst with vanadium catalyst as the former wear out. The vanadium catalyst is slightly more efficient than the platinum catalyst. It has marked advantages by reason of the available supply of vanadium, the price thereof, and the freedom from poison in the use of the same.

This suit is brought for an injunction and accounting by reason of alleged infringement by defendant of the patent in suit.

Defendant alleges that the patent in suit is invalid for the following reasons: (1) It lacks invention; (2) it lacks utility; (3) the claims are too broad; (4) introduction of new matter in application after the filing thereof and without affidavit thereto; (5) insufficient disclosure.

It will not be necessary to discuss reasons 2 and 5, because we found as facts, on what we believe to be sufficient evidence, that the patent has utility, and that a sufficient disclosure was made for the use thereof. See findings of fact Nos. 12, 15, and 16.

Does the patent in suit lack invention?

In the patent in suit, it is stated by the applicants: "We have discovered a new vanadium catalyst which effects conversion of sulfur dioxid and oxygen into sulfuric anhydrid to an extent of 96% and over of the contained sulfur dioxid." The patent further states: "Broadly considered, this invention consists in providing a carrier for a vanadium containing substance, which carrier has a fineness of division very much greater than that of similar carriers heretofore employed." After stating the materials that had been used by the applicants in the carrier, the patent further states: "We prefer to employ these materials of a degree of fineness such that the individual particles do not exceed twenty microns and are preferably in the neighborhood of one micron in diameter, although we are not limited to degrees of fineness falling within such limits, as coarser particles of carrier may be used and a large increase of conversion still be obtained. When we speak in our claims of a carrier very finely divided we mean to indicate a carrier in the here defined finely divided form, that is to say so much finer than those hitherto employed for vanadium catalysts that the catalyst of which it forms a part produces or is suited to produce, a commercially substantial increase of conversion over those hitherto known; but not so coarse that it is not capable of granulation. Particles of carrier should, therefore, not have a diameter larger than sixty (60) microns."

It is evident from the extracts of the patent quoted, and from the entire patent, that the principal invention claimed in the patent was fineness of division in the carrier. Vanadium catalysts were old; pumice and kieselguhr as carriers were old; fineness of division in the carriers of catalysts for other purposes was old; but no person before the patent in suit had been able to make a commercially efficient vanadium catalyst. There was a great demand for such catalysts, especially during the war, when platinum was very scarce and held at a very high price. The applicants solved this problem in an empirical science, in which it is not possible

to predict or reason by analogy what results would be obtained with different catalysts or with different carriers.

The patent further states that the applicants have discovered collateral or subsidiary steps in the production of a suitable vanadium catalyst as follows: "The addition of potassium hydrate or sodium hydrate, or the carbonate or the sulfate or the nitrate of these, in order to protect the new catalyst from deteriorating in catalytic activity." This step, from the evidence, is new, not obvious, and is successful for the purpose intended. The patent does not lack invention.

Are the claims too broad?

Defendant argues that claims Nos. 1, 2, 3, 4, 5, 6, and 8 are too broad, "that the record shows that the term 'a very finely divided carrier not exceeding 60 microns in diameter' is entirely too broad, does not define the invention, and includes a wide variety of carrier materials which do not produce the results claimed in the patent."

This contention cannot be sustained, for the reason that no claim of invention is made as to the carrier material. The claims relate to fineness of division of the material constituting the carrier and to the addition of potash or soda to maintain catalytic activity.

Defendant contends that claim No. 7 is too broad, and therefore invalid, because it does not refer to any carrier. The carrier is an essential element of the invention of the patent in suit. This claim is too broad, and therefore invalid. Johnson v. Duquesne Light Co., 29 F.(2d) 784 (D. C. W. D. Pa.).

Is the patent invalid because the claims and specifications were amended without affidavit or applicants' signatures so as to limit the particle size in the carrier to a diameter not exceeding 60 microns?

Defendant contends that this amendment violates R. S. § 4892 (U. S. C., tit. 35, § 35 [35 USCA § 35]). This section reads: "The applicant shall make oath that he does verily believe himself to be the original and first inventor or discoverer of the art, machine, manufacture, composition, or improvement for which he solicits a patent; that he does not know and does not believe that the same was ever before known or used."

The application before the amendment read: "Which carrier has a fineness of division very much greater than that of similar carriers heretofore employed." After a statement of the kinds of material appli-

cants had used in the carrier, the application further stated: "We prefer to employ these materials of a degree of fineness such that the individual particles do not exceed twenty microns and are preferably in the neighborhood of one micron in diameter, although we are not limited to degrees of fineness falling within such limits, as coarser particles of carrier may be used and a large increase of conversion still be obtained." The amendment did not add new matter. It made more definite and placed a limitation upon that which had previously been specified.

I am of the opinion that the patent in suit is valid except as to claim 7.

█ The remaining question is: Did defendant infringe the claims of the patent other than claim 7? The burden of proving infringement is on the plaintiff. Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co., 248 F. 705 (C. C. A. 3).

It is contended that the patent in suit should receive a narrow construction because it made, if any, only a slight advance in the art. Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 S. Ct. 521, 47 L. Ed. 689; also because the patent was a paper patent for eight years after it had been granted, and was not used in this country for fifteen years after the application had been filed therefor, Window Glass Mach. Co. v. Pittsburgh Window Glass Co., 276 F. 849 (C. C. A. 3); Elvin Mechanical Stoker Co. v. Locomotive Stoker Co., 286 F. 309 (C. C. A. 3); National Cash Register Co. v. Remington Arms Co., 4 F.(2d) 700 (C. C. A. 3); Reece Shoe Machinery Co. v. United Shoe Machinery Co., 244 F. 446 (C. C. A. 3); Lovell v. Seybold Mach. Co., 169 F. 288 (C. C. A. 2); National Malleable Castings Co. v. Buckeye Malleable Iron & Coupler Co., 171 F. 847 (C. C. A. 6); Houston v. Brown Mfg. Co., 270 F. 445 (C. C. A. 6); Besser v. Merrilat Culvert Core Co., 243 F. 611 (C. C. A. 8); Bradford v. Belknap Motor Co., 105 F. 63 (C. C. Me.), affirmed (C. C. A.) 115 F. 711; Cadwell et al. v. Firestone Tire & Rubber Co. (D. C.) 13 F.(2d) 483, affirmed (C. C. A.) 23 F.(2d) 1000; Toledo Scale Co. v. Barnes Scale Co., 18 F.(2d) 965 (D. C. E. D. Michigan) and Lagonda Mfg. Co. v. Elliott Co., 205 F. 149 (D. C. W. D. Pa.) affirmed (C. C. A.) 214 F. 581; Spengler Core Drilling Co. v. Spencer (D. C.) 10 F.(2d) 579.

It is true that vanadium catalysts were old in the art; that carriers of pumice and kieselguhr were old. It is also true that a fineness of division for carriers used for oth-

er purposes was old, and that the invention in the patent in suit is limited to fineness in division of carriers for the conversion of sulfur dioxid and oxygen into sulfuric acid and to the maintenance of catalytic activity by the addition of potash or soda. It is also true that the patent in suit was applied for October 9, 1914, and was not used commercially in this country until June, 1929; that during the World War there was an unprecedented demand in the sulfuric acid industry for an efficient catalyst other than the platinized asbestos catalyst then used; that the Monsanto Chemical Company and defendant, in 1927, were the first to use successfully in this country a vanadium catalyst, and that plaintiff did not use its patent until after the catalyst aforesaid had been successfully used and not until after plaintiff had tested the same. The patent in suit should be restricted to the specific embodiment of the invention disclosed therein.

Is the patent in suit infringed by the catalyst made and used by defendant? Does defendant's catalyst infringe the invention of the patent in suit which provides for a fineness of division of the carrier to particles not larger than sixty microns in diameter?

Defendant's catalyst does not infringe for the reason that defendant's carrier is composed of lumps of zeolite with kieselguhr imbedded therein which are larger than sixty microns in diameter. See findings of fact Nos. 19 and 20.

Does defendant's catalyst infringe the patent in suit by the use of potash?

The patent in suit provides for the use of potash in order to protect the new catalyst from deteriorating in catalytic activity. For reasons already stated, the patent in suit should be restricted to the specific disclosure therein. Defendant does not use potash in its catalyst to prevent it from deteriorating in catalytic activity. See findings of fact Nos. 19, 20, 21, and 22.

I am of the opinion, therefore, that defendant has not infringed the patent in suit.