## GENERAL CHEMICAL CO. v. STANDARD WHOLESALE PHOSPHATE & ACID WORKS, Inc.

### No. 2167.

District Court, D. Maryland.

Feb. 21, 1938.

William H. Davis,· W. Brown Morton, H. Stanley Mansfield, and Pennie, Davis, Marvin & Edmonds, all of New York City, and R. Contee Rose, of Baltimore, Md., for plaintiff.

Clair W. Fairbank, of New York City, Robert Ames Norton, of Stamford, and

Dean, Fairbank, Hirsch & Foster, all of New York City, and Charles McHenry Howard and Venable, Baetjer & Howard, all of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a patent infringement suit. The patent claimed to be infringed by the defendant company is Slama and Wolf patent No. 1,371,004, issued March 8, 1921, on application filed October 9, 1914, the plaintiff company having become the owner of the patent by assignment. The patent relates to the production and use of a catalyst, or contact substance, for the oxidation of sulphur dioxid which is part of the process of making sulphuric acid. The patent was reissued on August 21, 1934, for reasons hereinafter explained (reissue patent No. 19,282), and plaintiff's bill of complaint was amended, substituting this reissue patent for the original patent, with claims 1 to 6, and claim 8 identical with those of the original patent. The defendant company is charged with having infringed all of these seven claims. Claims 1 to 4 define the "catalyst"; claims 5 and 6 define the making of sulphuric anhydrid by using the catalyst; and claim 8 defines a method of making the catalyst. Claim 7 of the reissue patent was not in the original patent, nor is it involved in the present proceeding.

Defendant company has itself manufactured no catalyst, but is claimed to have infringed by using, in its manufacture of sulphuric acid, a catalyst manufactured by, and purchased from the Selden Company of Pittsburgh, Pennsylvania. The defendant company defends on the usual grounds of (1) noninfringement, and (2) invalidity.

A previous suit on the original Slama and Wolf patent was filed by the present plaintiff against the Selden Company in Pittsburgh on July 24, 1929. A trial had been on the merits, and the District Court dismissed the bill of complaint on June 17, 1932, holding claims 1 to 6, and 8 not infringed, and claim 7 invalid. See General Chemical Co. v. Selden Co., D.C., 60 F.2d 144. An appeal was taken to the Circuit Court of Appeals for the Third Circuit, and pending this appeal, the plaintiff, on March 23, 1933, filed a petition with the District Court in Pittsburgh to reopen the suit on the basis of alleged newly discovered evidence tending to show that the catalyst used by the defendant, the Selden

Company, was different from that which had been presented at the trial and which had been held not to infringe. The District Court, however, on May 8, 1933, dismissed this petition on the ground that even if such additional evidence were received, it did not appear to be sufficient ground to require a reversal or modification of the court's original decree, and that if plaintiff company had used ordinary diligence, such additional evidence could have been discovered in advance of the original trial. No appeal was taken from this order, and on September 20, 1933, the Circuit Court of Appeals affirmed the decree of the District Court. See General Chemical Co. v. Selden Co., 3 Cir., 67 F. 2d 133. On March 5, 1934, certiorari was denied by the Supreme Court. See General Chemical Co. v. Selden Co., 291 U.S. 678, 54 S.Ct. 529, 78 L.Ed. 1066.

Thereupon, the Selden Company on October 17, 1933, sought an injunction from the District Court in Pittsburgh, restraining the plaintiff company from prosecution of the present proceeding in the District of Maryland, which had been begun on March 22, 1933, against the defendant, Standard Wholesale Phosphate & Acid Works, Inc., which, as already explained, is a customer of the Selden Company. The Selden Company contended that the catalyst used by the Standard Company was the same as that which was held not to infringe in the Pittsburgh suit, and that the plaintiff company had no right to relitigate the question in a suit against a customer of it, the Selden Company, relying upon Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065. On the other hand, the plaintiff company contended that the catalyst used by the present defendant, the Standard Company, was different from that involved in the Pittsburgh litigation.

The District Court in Pittsburgh denied the Selden Company's motion without opinion. An appeal was taken to the Circuit Court of Appeals for the Third Circuit, and on September 26, 1934, the action of the District Court was affirmed, the appellate court stating that: "It does not appear here that the catalyst, which is alleged to be an infringement in the Maryland suit or the processes of its manufacture, are identical with the catalyst and process of manufacture covered in the Pennsylvania case, and in view of the record above recited, it would appear that the Pennsylvania court is without jurisdiction to try the issues as to the processes

and catalysts involved in the Maryland suit." Selden Co. v. General Chemical Co., 73 F.2d 195, 197.

As a result of this litigation in the Third Circuit, plaintiff company filed with the Patent Office a disclaimer as to claim 7 which had been declared invalid, and, as already explained, thereafter, on August 21, 1934, secured a reissuance of its patent' with a new and different claim 7, and amended its bill of complaint in the present proceeding, substituting the reissue patent in place of the original, canceled patent, but making no charge of infringement of the new claim 7.

On October 18, 1934, that is, shortly following the refusal of the Circuit Court of Appeals for the Third Circuit, on motion of the Selden Company, to enjoin the prosecution of the present suit, the Standard Company moved this court to dismiss the bill of complaint on the ground that the patent had become void for unreasonable delay in filing the disclaimer. That motion was granted and the bill of complaint dismissed. This court's reasons for its action are fully set forth in its opinion. See D.C., 8 F.Supp. 265. Thereupon the plaintiff company appealed, and on May 1, 1935, the Circuit Court of Appeals for the Fourth Circuit reversed the action of this court and remanded the case for trial. See 77 F.2d 230. A petition for certiorari was denied by the Supreme Court on October 14, 1935. See Standard Wholesale Phosphate & Acid Works v. General Chemical Co., 296 U.S. 606, 56 S.Ct. 122, 80 L.Ed. 430.

Thus, the present proceeding finally came on for trial on its merits before this court on March 2, 1936. In the very early stages of the hearing, it became apparent to this court that the questions involved were so highly scientific and technical as to require the services of a special master. Accordingly, this court declined to hear any extensive testimony, suspended the hearing, and after the fullest consideration being given to the selection of a scientist best equipped to serve the court, and at the same time free from any disqualification and acceptable to both parties, appointed Dr. J. C. W. Fraser, head of the Department of Chemistry of the Johns Hopkins University. As special master, Dr. Fraser was directed to hear the evidence upon, and submit findings of fact with respect to, certain basic questions which were set forth in the order of reference; this procedure being approved by counsel for both parties.

Extensive testimony was taken before the special master, and he conducted elaborate, independent tests; it being agreed by counsel that he should be at liberty to make any laboratory investigations that he might consider necessary bearing on any of the testimony in the case. On February 16, 1937, the special master filed his report with the court. Both plaintiff and defendant thereupon filed exceptions to it, which were duly heard, briefs were filed, and the matter is now before this court on these exceptions. So comprehensive are the questions propounded to and answered by the special master, that a ruling thereon by this court, together with this court's conclusions with respect to the applicable law, will result in meeting all of the real issues in the case relating to both (1) infringement and (2) validity of the patent.

Certain preliminary statements are necessary respecting the subject-matter of the patent in suit, for a satisfactory understanding of the issues here involved.

A "catalyst" is a substance used to stimulate chemical reaction, otherwise sluggish, between other substances, by bringing the reaction substances into contact with the catalyst substance, which merely by its presence, and without being used up, removes chemical resistance to reaction, just as a lubricant, by its presence, removes friction from the moving parts of a mechanical device.

Sulphuric acid has long been the basis for the manufacture of many other chemical products. It is essential in the manufacture of explosives and dyes. At the time of the application for the patent in suit, that is, in October, 1914, shortly after the beginning of the World War, platinum on an asbestos carrier was the standard catalyst used in the manufacture of sulphuric acid, and remained so until 1927. But platinum was both scarce and very expensive, and with the outbreak of the World War the demand for sulphuric acid due to its use in explosives became very great. All combatant nations were drawing heavily on such supply as there was of platinum. Normally, most of it came from the Ural Mountains, Russia. In 1914 vanadium, a metallic element of the phosphorous group, was selling in the neighborhood of $5 a pound, whereas platinum was selling as high as $160 an ounce. When the United States entered the World War in 1917, the president of the plaintiff company, who had become head of the committee on chemicals of the War Industries Board, made an in-

tensive study of the situation. During the War, our government also referred to the plaintiff company's research staff a copy of the then pending application of the patent in suit, with instructions to determine its possible value. Report was made to the government that the catalyst under this patent did not have a satisfactory commercial conversion, that is to say, for the manufacture of sulphuric acid on a satisfactory commercial basis that catalyst is desired which causes the minimum loss of the sulphur dioxid gases, which loss for satisfactory commercial conversion is agreed should not be over 6 or 7 per cent.

It was not until 1927 that the Monsanto Chemical Company of St. Louis put on the market a vanadium catalyst, the first in this country. Thereupon, the plaintiff company endeavored to duplicate this catalyst but was unsuccessful. Then in 1928, the Selden Company came into the market with the catalyst, the use of which by the present defendant is the cause of the present controversy; the present defendant being one of the Selden Company's earliest customers. It was not until June, 1929, that the catalyst of the patent in suit was used commercially; that is to say, not until the application for this patent had been in existence for approximately thirteen years, and not until the Selden Company had met with success with its catalyst, and it had been tested by the plaintiff, and the plaintiff had had the benefit of what the Selden Company had done.

The use of the catalyst for the manufacture of sulphuric acid is as follows, as described by the special master in his report, and is called "the contact process" found commercially desirable for making concentrated sulphuric acid in the great quantities required in many industrial operations. Sulphur burns easily and becomes sulphur dioxid, but the help of a catalyst is necessary to produce the second stage, or the oxidation which, in turn, is necessary to obtain sulphuric acid. Over the catalyst is passed a mixture of the sulphur dioxid and air. In this manner, the sulphur dioxid and the oxygen of the air are made to combine, forming sulphur trioxid or sulphuric anhydrid. Then the last step in the manufacture of the acid is taken, namely, this sulphur trioxid is mixed with water. This last mixture or reaction is easily accomplished, and there is no need for a catalyst.

Furthermore, in order to obtain a commercially successful catalyst using vanadium compounds, it is necessary that the latter shall be employed in an unusual manner. Where platinum is used, the problem is that of distributing a solid metal on the carrier, whereas in the case of vanadium, the problem is one of distributing the vanadium compound after it has been dissolved into a liquid solution with the aid of molten pyro-sulphates. Silica is used in the catalyst to perform two functions: First, without entering into any chemical reactions, it acts merely as a carrier to distribute the solution of the vanadium in the pyro-sulphate more effectively, by giving the catalyst pellets a more open texture, and thereby facilitating the contact of the gases with the vanadium compound contained within, as well as on the outer surfaces of the pellets; and, second, to bring about desorption of the sulphur trioxid from the catalyst.

The alleged invention forming the basis of the Slama and Wolf patent in suit is thus described in the introductory statements in the patent: "Broadly considered, this invention consists in providing a carrier for a vanadium containing substance, which carrier has a fineness of division very much greater than that of similar carriers heretofore employed. Prior to the invention of these applicants no vanadium catalysts had been used or described in which the carrier was less than 5000 microns in maximum dimension. As such carriers there have been used ground pumice, kieselguhr, precipitated silicic acid, stannic oxid, or stannic hydroxid, or mixtures of all or any of them: it is preferred to employ these materials of a degree of fineness such that the individual particles do not exceed twenty microns and are preferably in the neighborhood of one micron in diameter, although the invention is not limited to degrees of fineness falling within such limits, as coarser particles of carrier may be used and a large increase of conversion still be obtained. The reference in the claims to a carrier very finely divided is meant to indicate a carrier in the here defined finely divided form, that is to say so much finer than those hitherto employed for vanadium catalysts that the catalyst of which it forms a part produces or is suited to produce, a commercially substantial increase of conversion over those hitherto known; but not so coarse that it is not capable of granulation. Particles of carrier should,

therefore, not have a diameter of larger than sixty (60) microns."

In addition the patent specifies the use of certain salts of potassium or sodium for the purpose of protecting the catalyst from deterioration, and stabilizing it by removing any hygroscopic or moisture absorbing properties which it may possess. Finally, the use of a suitable binding agent is described, for the purpose of pressing or moulding the catalyst into any desired shape.

The patent provides two examples purporting to illustrate how the invention can best be carried into effect. The special master, however, found, for reasons hereinafter analyzed and with which we agree, that only Example 2 of the patent teaches a method of making a commercially successful catalyst. Example 2 is as follows: "Mix 316 parts of kieselguhr (either as it occurs in nature or after trituration) which may previously have been heated to a red heat, with an aqueous solution of 50 parts ammonium vanadate and 56 parts of potassium hydrate; thereupon evaporate off so much of the water that the remainder can be formed into granules; place this result in a furnace and heat at 480° C. with gas containing sulphur dioxid and oxygen (such as can be obtained from a pyrites burner) and then, if desired, continue the heating for some time in a current of air; the product of this operation is a catalytic agent which is ready for use in the same manner as the product in Example 1." Of the seven claims here in suit, we quote Nos. 1 and 4 as typical: "1. As a new composition of matter, a catalytic agent containing vanadium in chemical combination distributed on a very finely divided carrier not exceeding sixty microns in diameter." "4. As a new composition of matter, a catalytic agent containing vanadic oxid and potash distributed on a very finely divided carrier not exceeding sixty microns in diameter."

Turning now to the specific findings of the special master, they can best be understood by considering, seriatum, the questions referred to him, and his answers thereto, which cover one hundred and seventy pages evidencing many weeks of work—following the taking of testimony—of a most scientific, exacting character, all performed in a manner notable for its thoroughness and finally translated, as far as it is possible to do so, into language capable of being understood by the non-scientist.

The first question propounded for answer by the special master is: "Do either or both Exhibits 4 and 5 (defendant's catalyst) contain a substantial proportion of vanadium compound distributed on a very finely divided carrier not exceeding 60 microns in diameter?"

The special master gives a negative answer to this question. Summarizing the evidence, he stated that kieselguhr (a siliceous earth deposit) is distributed throughout defendant's catalyst, as exemplified by Exhibits 4 and 5; that some vanadium is to be found on most of these kieselguhr particles, but that the structure of defendant's catalyst is apparently non-homogenious, both as regards the distribution of kieselguhr as well as vanadium; and that the micro-photographic evidence submitted by the respective parties is not only very contradictory but subject to the greatest scrutiny; that none of it is entirely reliable, but that it may be summarized as bearing out the conclusion reached by the other tests, namely, that the vanadium is nonuniformly distributed, that there are areas, large in comparison with 60 microns, a micron being a one-thousandth of a millimeter, which show a sufficient concentration of vanadium to appear black in all the micro-photographs taken, and that there are equally large areas which must contain relatively much less vanadium, and which appear as half tones in properly made photographs, although it is not possible to say from the photographic evidence what is the relative concentration of vanadium compound in the two types of areas. The master's experiments further show that since the vanadium was in solution in the molten pyro-sulphates, the dispersion of the latter corresponded to the dispersion of the vanadium; in other words, that in the catalyst pellets, there is a uniform distribution of pyro-sulphate solution of vanadium, if the pellets are of uniform texture, otherwise not, and that one of the characteristic differences between the pellets of the patent in suit and the defendant's pellets, that is, Exhibits 4 and 5, was the uniformity of texture of the former and the non-uniformity of texture of the latter. Indeed, there appears to have been no disagreement on this point by anyone. But an effort was made on behalf of the plaintiff company to explain the difference on the ground that the Slama and Wolf pellets have been more thoroughly mixed than have defendant's pellets.

Summarizing the special master's conclusions, they are that the concentration of vanadium in the kieselguhr portions of defendant's catalyst, as exemplified by Exhibits 4 and 5, is less than 4 per cent., as found by the special master, which, according to the testimony of Dr. Merriam, plaintiff's expert, was the low limit for giving commercial conversion in these catalysts. Therefore, the special master's answer to question No. 1 is "no"; that is to say, that neither Exhibits 4 nor 5 contained a substantial proportion of vanadium compound distributed on a very finely divided carrier not exceeding 60 microns in diameter.

Question 2–a submitted to the special master is: "Does the specification of the patent give to the skilled chemist all the information necessary for the manufacture of a catalyst commercially useful in the manufacture of sulphuric acid?"

The special master gives a negative answer to this question when applied to Example 1 under the patent, because he found that the specifications in relation to Example 1 failed to give the information necessary to produce a commercially useful catalyst, in that the importance of alkali or alkali salts, without which he found commercial conversion impossible, was not mentioned, and also, in that a catalyst made pursuant to Example 1 has never had commercial application.

The special master, however, gave an affirmative answer to this question when applied to Example 2 of the patent. He found that, while the use of potassium hydroxide in Example 2 is necessary, its use according to the language of the specifications, is not intended to be a primary part of the catalyst, but is added merely to prevent deterioration of the catalyst. Nevertheless he concluded that a skillful chemist should be able to prepare a good commercial catalyst by following Example 2 of the patent in suit.

The special master points out that there is no indication anywhere in the patent that the addition of salts of potassium or sodium is for the purpose of any way enhancing the activity of the catalyst. Kieselguhr meets the fineness requirements of the patent with respect to a carrier. Thus if a vanadium compound, not containing an alkali, is distributed on kieselguhr, we have, according to the letter of the patent, the embodiment of all that is required to make the catalyst of the patent in suit. However, when vanadium, without alkali, is distributed on kieselguhr, a catalyst giving commercial conversion is not then obtained; that is to say, something more is necessary than the mere fineness of division of the carrier as specified in the patent. The patent also specifies that finely ground pumice may be used as a carrier. But such pumice must have a certain amount of free alkali available, otherwise, the catalyst will not give commercial conversion. In short, fineness of division of the carrier is not the only thing essential to produce a vanadium catalyst yielding commercial conversion, because the part that the salts of the alkali metals play is far more than that of protecting the vanadium catalyst from deterioration and the action of moisture. They play a very definite role in enhancing the activity of the catalyst by furnishing a liquid medium for the solution of the vanadium compound. In other words, the master found that while a good commercial catalyst may be made by following Example 2 of the patent, the descriptive matter which precedes Example 2 is incorrect, both as regards the effect of fineness of subdivision of the carrier, and the part which the salts of the alkaline metal play. Likewise, following Example 1 of the patent will not give a catalyst with satisfactory commercial conversion unless pumice high in alkali is used, and this latter fact is not taught in the patent. Or, stated in other words, the patent while mentioning everything necessary to make a good catalyst, does so in a distorted fashion, tending to confuse rather than to clarify the reason or necessity for the use of many of the ingredients which go to make up the catalyst.

Question 2–b submitted to the master is as follows: "With respect to the catalyst described in the patent in suit, is its conversion efficiency due to the distribution of the vandium compound on a finely divided carrier less than 60 microns in diameter?"

The special master found, as we have already seen, that the specified fineness of division of the carrier particles is responsible for only a minor part of the activity of the catalyst of the patent in suit. In short, he found that fineness of division, although one of the factors, was not the controlling factor in determining the catalytic activity; that while it is true one will not get commercial conversion without the proper fineness of the carrier, this in itself is not sufficient. The effect of alkali is a more important factor. For

example, the special master found that kieselguhr, which is silica, when used well within the 60 micron fineness limit of the patent in suit, does not give commercial conversion when ammonium vanidate is deposited upon it, *unless potash is added*.

Question 2–c submitted to the special master is as follows: "With respect to the catalyst described in the patent in suit, does it constitute an improvement in the art over previously known vanadium catalysts?"

Applying this question to Example 1 under the patent, the special master answers it in the negative, just as he answered Question 2–a in its application to Example 1. The answer is negative because no mention is made of the use of alkalis or alkali salts, which the special master finds to be indispensable. Thus, the special master finds that Example 1 is little, if any, improvement over the catalyst taught by the DeHaen patent, No. 687,-834. His conclusion is again substantiated by the fact that Example 1 of the patent has never had commercial application.

However, when applied to Example 2 under the patent, the special master answers Question 2–c in the affirmative, for the reason that while the specifications under Example 2 should have been more specific, he believes, as we have already seen, that they are, nevertheless, when considered as a whole, sufficient to enable one skilled in the art to prepare a catalyst commercially satisfactory..

Question 2–d referred to the special master is as follows: "What was the state of technical knowledge as of October, 1913 [when the invention under the patent is alleged to have been first conceived] as to the use of finely divided material of less than 60 microns in diameter as a carrier for any catalytic material in the manufacture of sulphuric acid?"

The special master finds that patent No. 4566 issued to Clemens Winkler in 1878 covers, in a very broad way, the use of catalyst carriers. It specifies, among others, the two carriers used in Example 1 and Example 2 of the patent in suit, namely, pumice and kieselguhr respectively. However, the special master finds that there is nothing in this patent to show, nor has any other evidence been presented to him showing that, prior to October 1913, any catalyst had been used for the manufacture of sulphuric acid involving the use of a carrier of particle size less than 60 microns.

Question 3 referred to the special master is as follows: "During the period from October 1914 until 1927 what was the industrial demand in the United States for catalysts for the manufacture of contact sulphuric acid, and, particularly, the demand for a substitute for platinum catalysts?"

The special master explains how, as we have already seen, the World War created suddenly an extraordinary demand for sulphuric acid but finds that, in spite of the intensified experiments that were made during the period from October 1914 until 1927, no substitute for platinum was known in this country, and that platinum, scarce as it was, was the only catalyst available for the manufacture of contact sulphuric acid.

Question No. 4 referred to the special master is as follows: "Prior to 1929, what, if anything did the plaintiff do regarding vanadium catalysts for sulphuric acid manufacture and with what technical results?"

Answering this question the special master states his findings to be that from the year 1915 (when the plaintiff company's research staff first had a copy of the patent application), until 1929, the plaintiff company had investigated the vanadium catalyst on several occasions, but had not succeeded in obtaining such a catalyst which could give a useful commercial conversion and that, until that year, plaintiff company had made no commercial use of vanadium catalysts; that while in 1929 the plaintiff company's so-called K. F. I. catalyst was used commercially, this catalyst was made under another patent to Joseph, No. 1,887,978, and that it was not until the following year, 1930, that the Slama and Wolf catalyst was first used on a commercial scale.

Question No. 5 referred to the special master is as follows: "Does the De Haen patent #687,834, teach those skilled in the art how to make a commercially useful catalyst for the manufacture of sulphuric acid?"

The special master's answer to this question is "no." He finds that the De Haen patent does not teach that any advantage may be gained by the use of alkalis or alkali salts, nor by using silica, in any form, as a carrier for the vanadium compound. He concedes that the advantages to be gained by these steps may be gleaned by investigating the many possibilities under the broad general statements of

De Haen in regard to the vanadium compound that may be used, as well as the carrier that may be used, but finds that these steps are distinctly not taught by the De Haen patent, for otherwise his conversion yield would not have been set as low as it is, namely, 84 per cent., and, furthermore, there is no evidence of any commercial application of the De Haen patent.

Question No. 6 referred to the special master is as follows: "What is the conversion efficiency of plaintiff's catalyst and defendant's catalyst, Exhibits 4 and 5?"

In answering this question the special master has properly limited his consideration to that portion of the evidence which is based on commercial conversion and on laboratory tests of samples of catalysts made on a commercial scale. He finds from such evidence that both catalysts are very highly efficient, with strikingly similar behavior. Tests which the Master himself conducted with respect to both Exhibits showed that, at low temperatures, Exhibit 5 was somewhat more active catalytically than Exhibit 4, but that at higher temperatures the order was slightly reversed. It appears that Example 1 of the Slama and Wolf Patent has never been used commercially by plaintiff, and that Example 2 of this patent has been used on a commercial scale in only one unit.

The conversion efficiency figures which the special master gives as his answer to question 6 are as follows, showing that the conversion efficiency · of both defendant's catalysts is somewhat greater than that of the catalyst in the patent in suit: Defendant's catalyst, Exhibit 5, 97.7 per cent., normal load; defendant's catalyst, Exhibit 4, 97.6 per cent., normal load; plaintiff's Slama & Wolf patent, Example 2, 91.6 per cent., normal load; plaintiff's Slama & Wolf patent, Example 2, 96.8 per cent., 58 per cent. of normal load.

The seventh question referred to the special master is as follows: "What was the procedure employed in making the catalysts, Exhibits 4 and 5?"

The special master reviews the conflict in evidence with respect to the procedure employed in making these two catalysts. He explains the discrepancies between the method described by the Selden Company as having always been used by it for producing its catalysts, represented by Exhibits 4 and 5, and the alleged method of preparing the catalysts as described in Exhibit 17, which is a description furnished by the plaintiff company of the method used by the Selden Company in the preparation of its catalysts subsequent to the Pittsburgh litigation and alleged to embody material changes over the method in use prior thereto. The special master states that he is unable to reconcile these discrepancies but finds them, in any event, to be inconsequential, and concludes that both methods described produced the same catalysts, and that if the catalyst of Exhibit 5 be made according to directions given in Exhibit 17, the slight departures from those used in making the catalysts of Exhibit 4 would make no difference in the catalysts actually produced.

The process employed by defendant company in making its catalysts, as described by its own witnesses is as follows: (1) Viscous potassium silicate solution is added to kieselguhr by sprinkling; (2) then is added a potassium aluminium compound which, with the first compound, forms a gelatinous aluminium compound commonly known as zeolite; (3) a potassium aluminium vanidate compound is then added which, with the two previous compounds, forms a jelly substance consisting mostly of water. As this dries, pores are formed all through it and it becomes a spongelike substance. Then, when this mass is heated, the potassium pyro-sulphate (which is formed in the sulphur gases present in the converter) becomes liquid, with the vanadium compound dissolved therein, and lodges in the porous places of the jellylike mass, and only a comparatively small amount, not more than 10 per cent. or 12 per cent. of this liquid, is distributed upon the particles of the kieselguhr. In other words, the kieselguhr is not really the carrier at all, but the jellylike mass is the carrier.

The process for making the catalyst under the patent in suit, Example 2, is, briefly summarized, as follows: (1) A solution of potassium hydroxide and ammonium vanidate are put on · the kieselguhr; (2) the water is evaporated, and this leaves the vanadium and· potash on the minute particles of the kieselguhr all through the mass.

Question 1–a submitted to the master is as follows: "Do either of the catalysts in Exhibits 4 and 5 contain vanadium in chemical combination distributed on a very finely divided carrier not exceeding 60 microns in diameter?"

This question was propounded, and submitted to the special master at the close of the hearing on the exceptions to his

findings on the other questions, for the purpose of having the special master's conclusions with respect to those portions of the defendant company's pellets found by him to contain less than enough vanadium to constitute them catalysts, as well as with respect to those other, harder portions, found by him to constitute catalysts and covered by his answer to Question 1, thus insuring more complete factual findings by the special master.

Summing up his answer to this question, the special master states that the vanadium in both defendant's pellets, Exhibits 4 and 5, and in those of the patent in suit, Example 2, is in solution in molten pyro-sulphate, and that when the catalysts are in operation, this solution will distribute the vanadium throughout these pellets by operation of the capillary forces prevailing in these pellets. However, he finds that in the Slama and Wolf catalysts, Example 2, the structure is uniform and the pyro-sulphate solution of vanadium will, therefore, be uniformly distributed, as indicated by the weight of the evidence, whereas, in defendant's catalyst, Exhibits 4 and 5, the poracity is not uniform, but varies from that in the strictly kieselguhr portions to the fine poracity in the silicate portions and, therefore, the distribution of the pyro-sulphate solution of vanadium in these latter pellets will necessarily be nonuniform, and he finds that in the strictly kieselguhr portions of these pellets, while there is some vanadium present, the concentration of vanadium is much below that required to produce a commercial catalyst.

### The Question of Validity.

Having thus reviewed in detail the findings of the special master as disclosed in his report, through his answers to the eleven basic questions that were propounded to him, we are now prepared, since we find no reason to disagree with any of these factual findings, to consider them in their relation to the question of (1) validity of the patent in suit, and (2) whether it has been infringed by the defendant company.

Turning first to the question of validity, the defendant company, upon which rests the burden of proving invalidity, has attacked the patent primarily upon two grounds: (1) Insufficient disclosure in the specifications, and (2) that Slama and Wolf were not in fact the original inventors of the alleged novelty in the patent but Dr. Scharff, in that he is alleged to have first proposed the use of kieselguhr, alkalies and other salts in the Slama and Wolf catalyst without which it would have remained entirely inoperative from the point of view of successful commercial conversion.

The special master has found, and there appears to be no credible evidence to the contrary, that the patent in suit does constitute an improvement in the art over any previously known vanadium catalyst. Both kieselguhr and pumice had been previously used as carriers, but neither these nor any other carrier having a particle size less than 60 microns had ever been previously used for vanadium in preparing a catalyst for the manufacture of sulphuric acid. Patent No. 4,566 to Clemens Winkler, issued in 1878, covers in a very broad way the use of catalyst carriers and specified, among others, pumice and kieselguhr but beyond this it contains none of the teaching of the patent in suit. Likewise, the patent to De Haen, No. 687,834, did not teach the steps necessary to produce a commercially satisfactory catalyst for the manufacture of sulphuric acid and furthermore, no commercial use has ever been made of the De Haen patent, although issued in 1901.

With respect to the question of inadequate disclosure, while it is true that defendant is supported in its contention on this point by the special master with respect to Example 1 of the patent, in that he found it is silent in its teaching with respect to the necessity for use of free alkalies in order to produce a catalyst giving commercial conversion, and that a catalyst made under Example 1 has never been used commercially, the special master has found that Example 2, although confusing and misleading, nevertheless, is believed by him to be sufficient to enable one skilled in the art to produce a commercial catalyst, as evidenced by the fact that a catalyst made in accordance with Example 2 has had commercial use. What the special master in fact found with regard to the disclosure respecting the salts of the alkaline metals was that this disclosure is in error merely as to the theory of action of such salts.

Lastly, we turn to the further argument that the patent is invalid because Dr. Scharff (who was chief of the Acid Division of the Badische Company of Ludwigshafen, Germany), and not Slama and Wolf, who were associated at the same time with the same company as

chemists, was in fact the real inventor, because it was he that first called the attention of Slama and Wolf to the use of kieselguhr and alkalies and their salts which made the catalyst a successful one. It is true that according to Dr. Scharff's testimony, the patentees had been using an alkali in a vandic acid solution on other finely divided carriers, and that he told the patentees to use kieselguhr and potassium hydroxide. However, under all the circumstances we are not prepared to say that Dr. Scharff was in fact the inventor or that he should have been named as one of the inventors, particularly in view of the rather meager and somewhat confusing character of Dr. Scharff's testimony. For example, at one point, when asked whether it was his idea that the alkaline solution of potash and vanadium be put on the kieselguhr to make the contact mass, he replied: "Yes, naturally. The alkaline vanadic acid solution was being used to spray on any carrier used, comminuted, precipitated silicic acid as well as natural silicic acid which is available in the natural form, and I told Slama then to work with kieselguhr." Later, however, when asked whether he intended to be understood as saying that Slama and Wolf merely carried out his instructions in making the contact mass the way he told them to make it, he answered: "I only stated the general problem. The method of the means was a matter of Slama and Wolf. As to the means that was a matter for Slama and Wolf. I have to specifically state those gentlemen were chemists, not mere laboratory assistants or workmen. Therefore, all they had learned of as chemists they had to apply to that problem." In other words, one cannot say with assurance from the present state of the testimony that the whole essence of the invention was contributed by Dr. Scharff, or that he contributed anything that gave value or commercial operativeness to the patent disclosure to the extent that requires us to conclude that he was *the* inventor, or one of the inventors.

For the aforegoing reasons, we find the patent in suit valid, and the exceptions of the defendant company to the special master's findings must be overruled.

### The Question of Infringement.

With respect to the question of infringement, a comparison of the brief summaries which have heretofore been given of the method taught by Example 2 for making the catalyst of the patent in suit and that employed by the defendant company for making its catalyst, makes it apparent even to the lay mind that the two methods are materially different. We will not repeat the comparison but merely refer to it as given in an earlier part of this opinion. The most significant feature of the special master's findings—which is, in fact, an entirely original contribution to this branch of science—is that in all of the catalysts the vanadium compounds constituting the active catalytic material are actually in solution in molten pyrosulphate when the catalysts are in operation; that is to say, that these vanadium compounds, as such, are not distributed on *any* carrier, but what is, in fact, distributed is the pyro-sulphate solution of these vanadium compounds, through the porous pellets by the capillary forces operating within the pellets.

Summarizing the results of his comparative studies, the special master found that in Example 2 of the patent in suit the pellet structure is uniform and the pyro-sulphate solution of vanadium, therefore, is uniformly distributed. That is to say, this catalyst is made up of fine kieselguhr particles with the pyro-sulphate solution uniformly distributed upon them. The special master found, on the other hand, with respect to the defendant's catalyst that its porosity is not uniform but varies from that in the strictly kieselguhr portions to a much finer porosity in the silicate portions and that, therefore, the distribution of the pyro-sulphate solution in this catalyst will necessarily be non-uniform. In other words, the special master found that the catalytically active portions of defendant's pellet are highly porous masses having most of the pyro-sulphate solution in these masses; and that while defendant's pellet has a considerable portion of fine kieselguhr particles on which the pyro-sulphate solution is distributed, just as in the catalyst of the patent in suit, such distribution is exceedingly small (not in excess of 1% of the pyro-sulphate solution) and this portion of defendant's pellet forms no essential part of the catalyst.

It would appear that this distinction is vital and clearly sufficient to refute infringement. The special master's findings on this highly technical and controlling point are well substantiated, not merely by the weight of the more credible testimony, but by the elaborate independent experiments which the special master conducted by using the property of vanadium for ab-

sorbing ultra-violet light (which both plaintiff and defendant approved as a means of testing for the presence of vanadium), whereby he was able to express semi-quantitatively the relative concentration of vanadium in different portions of a section of the defendant's pellet, as an addition to the previously demonstrated non-uniform distribution of this constituent.

Finally, summarizing our conclusions, we find the patent in suit as taught by Example 2 to be valid, but not infringed by the catalyst of the defendant company. In other words, we conclude that the exceptions of the plaintiff company to the findings of the special master are all without merit and must, therefore, be overruled. These exceptions are very numerous. We have not deemed it necessary to take each one of them up separately or in detail because, in our treatment of the main issues of the case, we have considered every question raised. by any of these exceptions which goes to the real merits of the controversy. The other objections are secondary, and likewise, we find to be without merit. For example, we find no just ground for opposing the special master's independent researches even though different in principle from the experiments resorted to by the experts on both sides. Permission was expressly granted by the Court to the special master, and approved by counsel for both parties, to make any experiments of any kind that he might deem helpful toward a correct solution of any of the problems which he was called upon to solve by the order of reference. Likewise, we find no merit in the exception taken to the special master's exclusion of certain evidence offered by the plaintiff as rebuttal testimony. It had been arranged and agreed between counsel for both parties that a joint meeting of their experts should be held in New York where additional tests might be made to determine the value of the work and alleged disclosures of Mr. Grosvenor, one of defendant's witnesses; but the plaintiff company failed to have a representative present when these additional tests were made. The results of these additional experiments were properly admitted in evidence by the special master, and since the plaintiff company, through no fault of the defendant company, failed to participate in the making of these experiments as had been contemplated, the special master was entirely correct in denying to the plaintiff company an opportunity later to do ex parte what it had had an opportunity to do inter partes. He acted in conformity with Equity Rule 60, 28 U.S.C.A. following section 723.

Similarly, there is no merit in the exceptions taken to the special master having limited his consideration of the evidence to tests made on catalysts manufactured on a commercial scale. The reasons for so doing are self-evident and so sound as to require little discussion. Whether the catalysts in litigation have commercial utility is a dominant inquiry. It is reasonable, therefore, to say that the best, or in fact the only reliable, way in which to determine such utility, is by simulating as nearly as possible the conditions under which the catalyst is intended to operate commercially.

The District Court in Pittsburgh held (General Chemical Co. v. Selden Co., 60 F.2d 144, 151), that defendant's catalyst did not infringe "for the reason that defendant's carrier is composed of lumps of zeolite with kieselguhr imbedded therein which are larger than sixty microns in diameter." It also held that the use of potash in defendant's catalyst was not an infringement, because the patent in suit provides for the use of potash "in order to protect the new catalyst from deteriorating in catalytic activity. For reasons already stated, the patent in suit should be restricted to the specific disclosure therein. Defendant does not use potash in its catalyst to prevent it from deteriorating in catalytic activity."

The appellate court affirmed the District Court, saying (General Chemical Co. v. Selden Co., 3 Cir., 67 F.2d 133, 134): "We are clear that the court below correctly held that this patent, instead of promoting the art, was a mere paper one whose function was words, not work, and which, if valid, must be confined to its own narrow limits. So construed, the court committed no error in holding it was not infringed." This conclusion was reached by the appellate court after pointing out that whatever might be the exact facts respecting the successful use of the plaintiff's catalyst in Germany where it was also patented, and without impugning bad faith to the present patentees in taking out their American patent, the instructions given in their application gave no light to the War Industries Board at the time of this country's entrance into the World War, to the president of the plaintiff company in his eagerness to find a cheaper substitute for platinum, to Pro-

fessor Scott of the plaintiff company's research staff, or to the management of the plaintiff company, and that plaintiff's first and only use of vanadium with kieselguhr was taught them not by its patent, but by what plaintiff learned from the Selden catalyst, that is, from defendant's practice.

It will thus be seen that the findings of the special master and of the District Court in Pittsburgh (later affirmed by the Circuit Court of Appeals for the Third Circuit) are basically the same, for both found that in the defendant's catalyst (1) there is no substantial portion of the vanadium compound distributed on kieselguhr particles serving as the carrier for the vanadium; (2) there is a highly porous potassium aluminum silicate compound present (referred to as zeolite in the Pennsylvania litigation); and (3) that this highly porous potassium aluminum silicate and not the kieselguhr is the carrier for the vanadium compound. The only material difference between the two findings is that the District Court in Pittsburgh concluded that the vanadium was a coating on the porous lumps whereas the special master, as we have seen, has found that it became liquid and was absorbed in the microscopic pores of the silicate lumps. However, this distinction is of no real consequence for present purposes with respect to the question of infringement, because both court and special master found that these lumps were far larger than 60 microns in diameter.

■ Furthermore, it is clear that the present suit has resulted in a retrial of the same issues litigated and determined in the proceedings in the Third Circuit, because, as we have seen, the formula employed in making defendant's catalyst here in suit is the same in all essential principles as that employed in making the catalyst involved in the other litigation. This is confirmed by reference to finding of fact No. 19 of the District Court in Pittsburgh. See General Chemical Co. v. Selden Co., 60 F.2d 144, 147. It is further significant that the plaintiff company has filed no exceptions to any portion of the special master's answer to Question No. 7, which deals with this precise phase of the controversy. The Supreme Court, in Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065, held that a defeated party in a patent infringement suit may be restrained from interfering with the business of a successful defendant by bringing infringement suits based on the same patents against customers of such successful defendant. The court said, 206 U.S. 285, at pages 289, 290, 27 S.Ct. 611, 613, 51 L.Ed. 1065: "The effect which may reasonably be anticipated of harassing the purchasers of Kessler's manufactures by claims for damages on account of the use of them, would be to diminish Kessler's opportunities for sale. No one wishes to buy anything if with it he must buy a law suit. That the effect to be anticipated was the actual effect of the Breitwieser suit is shown by the statement of facts. Kessler's customers ceased to send orders for lighters, and even refused to pay for those which had already been delivered. Any action which has such results is manifestly in violation of the obligation of Eldred, and the corresponding right of Kessler, established by the judgment. Leaving entirely out of view any rights which Kessler's customers have or may have, it is Kessler's right that those customers should, in respect of the articles before the court in the previous judgment, be let alone by Eldred, and it is Eldred's duty to let them alone. The judgment in the previous case fails of the full effect which the law attaches to it if this is not so. If rights between litigants are once established by the final judgment of a court of competent jurisdiction those rights must be recognized in every way, and wherever the judgment is entitled to respect, by those who are bound by it. Having, then, by virtue of the judgment, the right to sell his wares freely, without hindrance from Eldred, must Kessler stand by and see that right violated, and then bring an action at law for the resulting damage, or may he prevent the infliction of the unlawful injury by proceedings in personam in equity? If Eldred succeeds in his suit against one of Kessler's customers, he will naturally bring suits against others. He may bring suits against others, whether he succeeds in one suit or not. There may be, and there is likely to be, a multiplicity of suits. It is certain that such suits, if unsuccessful, would, at the same time, tend to diminish Kessler's sales, and to impose upon him the expense of defending many suits in order to maintain the right which, by a judgment, has already been declared to exist. If the suits are successful the result will be practically to destroy Kessler's judgment right. Moreover though the impairment or destruction of Kessler's right would certainly follow from the course of conduct which Eldred has begun, it would be difficult to

prove, in an action at law, the extent of the damage inflicted."

 Thus, without suggesting that the courts of the Third Circuit should have done other than they did, under the circumstances, with respect to the questions presented to them as connected with the present litigation in this court, we feel it our duty to emphasize the fact that it is difficult for us to believe that the present suit could not and should not have been avoided in conformity with the ruling of the Supreme Court, if proper care and effort had been taken by the plaintiff company to compare the catalysts with respect to which there is no evidence that the defandant company would not have fully cooperated in advance of commencing this litigation which, aside from being extremely protracted, and costly to both parties, has proved a great and apparently unwarranted burden upon this court, producing merely a duplication of effort and resulting properly, therefore, in a mere duplication of the conclusions reached in the Third Circuit.

A decree will be signed in accordance with this opinion.